Paul L. TESSIER, M.D., Plaintiff,

v.

PLASTIC SURGERY SPECIALISTS, INC., William P. Magee, Jr., M.D., Jonathon S. Jacobs, M.D., Charles E. Horton, M.D., Jerome E. Adamson, M.D., James H. Carraway, M.D., John B. McCraw, M.D., J. Craig Merrill, M.D., and Neil M. Bialkin, Defendants.

Civ. A. No. 89–399–N.

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 20, 1990.

Thomas J. Harlan, Jr., Thomas J. Harlan, Jr. and Associates, Norfolk, Va., for Charles E. Horton, M.D., Jerome E. Adamson, M.D. and John B. McCraw, M.D.

Deborah L. Mancoll and John M. Ryan, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Neil M. Bialkin.

Gregory N. Stillman and D. Arthur Kelsey, Hunton & Williams, Norfolk, Va., for Plastic Surgery Specialists, Inc.

Hunter W. Sims, Jr., Kaufman and Canoles, Norfolk, Va., for David A. Gilbert.

Thomas B. Shuttleworth, Gregory A. Giordano and Robert J. Haddad, Shuttleworth, Ruloff, Giordano & Kahle, Virginia Beach, Va., for William P. Magee, Jr., M.D.

## ORDER

CLARKE, District Judge.

This matter arises on defendants' cross-motions to disqualify counsel. Defendants Charles E. Horton, M.D., Jerome E. Adamson, M.D., and John B. McCraw, M.D. ["the Horton group"], by their counsel Thomas J. Harlan, Jr., move this Court for an Order disqualifying Gregory Stillman, Esquire and the law firm of Hunton & Williams from representing Plastic Surgery Specialists, Inc. ["PSSI"] in the pending action. Correspondingly, defendant William P. Magee, Jr., M.D., by his counsel Thomas B. Shuttleworth, moves this Court for an Order disqualifying Thomas J. Harlan, Jr., Esquire and the law firm of Thomas J. Harlan, Jr. and Associates from representing the Horton group in the pending action. In the alternative, Dr. Magee moves this Court for an Order disqualifying Mr. Harlan and the law firm Harlan and Associates from representing the Horton group in the cross-claim that has been filed against Dr. Magee and others by the Horton group. All non-moving parties have responded in opposition and argument was heard on Sep-

tember 18, 1989. Accordingly, this matter is ripe for disposition.

### Facts

The following are the pertinent facts taken from the uncontradicted statements in the briefs, the pleadings and affidavits filed with the Court and from arguments before the Court.

Defendant PSSI was a professional corporation under Virginia law that specialized in plastic surgery. The eight physician defendants were formerly shareholders and members of the operating board of directors. Defendant Neil M. Bialkin was the business administrator of PSSI.

Plaintiff Paul L. Tessier, M.D., a citizen of France, is a world renowned cranio-facial surgeon. He began his association with PSSI in November, 1983. Since that time he has travelled to the United States once or twice a year to perform surgery in Norfolk for two week periods. In the underlying action, Tessier claims that he was not fully and fairly compensated for the services he performed on behalf of PSSI.

Due to irreconcilable differences among the physicians regarding the business affairs of PSSI, the shareholder physicians split into two equally divided groups. One group comprising Dr. Magee, Dr. Gilbert, Dr. Jacobs, and Dr. Merrill will be referred to as the Magee group and the other group comprising Dr. Horton, Dr. Adamson, Dr. McCraw, and Dr. Carraway will be referred to as the Horton group. As a result, the Board of Directors became deadlocked. A petition for involuntary dissolution was filed in the Circuit Court for the City of Norfolk. The Circuit Court appointed H. Leon Hodges as custodian. Ultimately, the parties reached an agreement to voluntarily dissolve PSSI as of December 31, 1988.

The dissolution of PSSI remains governed by the Agreement of Reorganization and Dissolution executed by all shareholders. Under the heading "Assumption of Liabilities," section 1.2 of the Agreement of Reorganization states:

(a) As of the Effective Time, each of the New Corporations shall assume and agree to pay ... all of the liabilities,

whether fixed or contingent, known or unknown, now existing or hereafter arising, relating to Section 1.1 hereof and relating to the Shareholders to be employed by such New Corporation (the "Related Liabilities"), including, without limitation, the following:

. . . .

(iv) liabilities determined to have been caused by or arising from the acts or omissions of the Shareholders to be employed by such New Corporation prior to the Effective Time, including without limitation any medical malpractice claims and any acts or omissions of such Shareholders relating to federal, state or third-party payor reimbursement claims. All parties agree that the purpose of the Section 1.2(a)(iv) is to place liability on the particular New Corporation which employs the Shareholder whose conduct gives rise to or causes the liability.

Section 1.2(a)(iv) provides that any judgment against PSSI caused by an individual shareholder will be borne by that individual shareholder and the new entity or corporation under whose banner he is now practicing.

Hunton & Williams began representing PSSI in January, 1988 and represented PSSI in the dissolution proceedings.

In April 1989, Dr. Tessier filed an action in this Court against Dr. Magee and Dr. Magee's "New Corporation," Plastic Surgery Associates, Inc. ["PSA"]. The action sought injunctive relief prohibiting the use of Dr. Tessier's name on PSA's stationary and the production of patient records. Hunton & Williams defended Dr. Magee and PSA in that case, which has now been settled.

In the following month, on May 22, 1989, Dr. Tessier filed the present action again in this Court. As defendants he named PSSI, PSSI's former shareholders (alleging fraud against Dr. Magee and others) and PSSI's administrator Mr. Bialkin. As stated above, Dr. Tessier seeks full and fair compensation for the services he performed while associated with PSSI. Hunton & Williams represents PSSI in this action. Later, on June 22, 1989 the Horton group defendants, by their counsel Mr. Harlan, filed a cross-claim against defendants Dr. Magee, Mr. Bialkin, and PSSI. In no uncertain terms, the Horton group acknowledges that Dr. Tessier may have been defrauded and charges Dr. Magee and Mr. Bialkin with orchestrating a fraudulent scheme designed to deprive Dr. Tessier of due compensation. The Horton group also looks to PSSI for indemnification of legal costs should they prevail in their defense of the claims asserted against them by Dr. Tessier.

During 1983 and 1984, Mr. Harlan, then with the law firm of Dudley & Pincus, also provided legal services for PSSI. Mr. Bialkin had requested Montgomery Knight, Esquire, also of Dudley & Pincus, to draft some proposed personnel contracts for the corporation. However, disagreements arose between Mr. Knight and Mr. Bialkin concerning the timeliness of Mr. Knight's work. Mr. Harlan mediated the dispute and ultimately decided to sever his firm's legal relationship with Mr. Bialkin and PSSI. Mr. Harlan and the law firm of Thomas J. Harlan & Associates have continually represented the Horton group defendants throughout the state court dissolution proceedings and the present matter.

#### The Motion to Disqualify Mr. Stillman and the Law Firm of Hunton & Williams

The Horton group, by their counsel Mr. Harlan, contends that the Virginia Code of Professional Responsibility prohibits Mr. Stillman and the law firm of Hunton & Williams from representing PSSI in the pending action.[1] Specifically, they allege

---

1. As stated above, the Horton group of defendants consists of Dr. Horton, Dr. Adamson and Dr. McCraw. They allege that prior to the dissolution of PSSI, the shareholder/directors had split into two equal factions. The Horton faction was comprised of Dr. Horton, Dr. Adamson, Dr. McCraw, and Dr. Carraway; the Magee faction was comprised of Dr. Magee, Dr. Gilbert, Dr. Jacobs, and Dr. Merrill. The inability of these two factions to make business decisions together led to the dissolution of PSSI. The Horton group alleges that the termination of the law firm of Willcox & Savage and the subsequent retention of the law firm of Hunton &

that Mr. Stillman's prior representation of Dr. Magee and PSA [hereinafter referred to as "the PSA litigation"] prohibits him from representing PSSI in the instant matter because it would constitute impermissible successive representation within the meaning of Disciplinary Rule 5–105(D).[2]

The problem implicated by successive representation is the potential for the use of confidences gained from a former client to the detriment of that client or the failure to use information favorable to the present client in order to protect the confidentiality of the former client. The Horton group argues that here, pursuant to the Reorganization Agreement, if a judgment is entered against PSSI, and Dr. Magee is found to have caused the judgment to be so entered, then Mr. Stillman will be in the inappropriate position of having to sue his former client in order to realize a judgment for his current client. Additionally, the Horton group argues that Canon 9 of the Code of Professional Responsibility mandates disqualification in this matter. Can-

on 9 states that "the lawyer should avoid even the appearance of professional impropriety." They contend that the present situation may appear unethical to laymen and thereby erode public confidence in the integrity of the judicial system.

■ Hunton & Williams responds by noting that they were hired by Mr. H. Leon Hodges, the current custodian of PSSI. They argue that Mr. Hodges's right to freely choose counsel should be vigorously protected, especially in light of the recent practice to employ the motion to disqualify counsel as a litigation sword instead of an ethical shield. With respect to the successive representation allegation, Hunton & Williams maintains that the matters at issue in the PSA litigation and in this action are not "substantially related." And that, even if they were, there is no "actual conflict" to warrant disqualification. Finally, Hunton & Williams contends that the Horton group's "appearance of impropriety" argument is mere makeweight.[3]

Williams as corporate counsel was a unilateral act of then–President Dr. Magee and was approved only by the Magee faction.

2. Initially, the Horton group contended that Mr. Stillman represented not only PSSI, but also Dr. Jacobs and Dr. Carraway as well. If true, such attorney-client relationships would raise further ethical concerns about multiple and simultaneous representation. However, Mr. Stillman has stated in a letter to this Court that he represents only PSSI in the present case. Thus, the present issue, as framed by counsel, is one of successive representation only. The Court will, however, address an actual conflict arising in a *multiple representation* context below.

Mr. Stillman has not informed the Court of whether PSA remains a client of Hunton & Williams. Presumably, PSA would, if necessary, be represented by the same law firm as Dr. Magee. Dr. Magee is represented by Mr. Shuttleworth of the law firm of Shuttleworth, Ruloff, Giordano & Kahle in this litigation.

The ethical standards of practice before this court are set out in the Virginia Code of Professional Responsibility. *See* Local Rules of Practice, United States District Court for the Eastern District of Virginia, Rule 7(I) (1989). Disciplinary Rule 5–105(D) states:

A lawyer who has represented a client in a matter shall not thereafter represent another person *in the same or substantially related matter* if the interests of that person is adverse in any material respects to the interest

of the former client unless the former client *consents after disclosure.*
Va.Code Prof. Resp. DR 5–105(D) (emphasis added).

3. Hunton & Williams also argues that the Horton group lacks standing to challenge PSSI's choice of counsel. They assert that only PSSI through its custodian has the right to object to any successive representation. Disciplinary Rule 1–103 and Ethical Consideration 1–4 of the Virginia Code of Professional Responsibility provide that as officers of the court, all attorneys have a continuing obligation to disclose to the court *any* violation of the rules of professional conduct. *See United States v. Clarkson,* 567 F.2d 270, 271–72 n. 1 (4th Cir.1977) ("[A]ny member of the bar aware of the facts justifying a disqualification of counsel is obligated to call it to the attention of the court."). The Fourth, Fifth, and First Circuit Courts of Appeal have held that disqualification may properly be sought by adverse counsel even though he or she is not representing the aggrieved client. *Id.; Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.,* 563 F.2d 671, 673 (5th Cir.1977); *Kevlik v. Goldstein,* 724 F.2d 844, 848 (1st Cir. 1984). Furthermore, as will be discussed later in this opinion, each Horton group physician is a *de facto* client of Hunton & Williams. The Court holds that the moving parties have the requisite standing to bring motions for disqualification of counsel based on successive representation.

### Analysis

The potential variety of interests which may dilute an attorney's loyalty to a client is measureless. Often in the course of complex litigation an attorney will fail to identify what others clearly recognize as an irreconcilable conflict among interests. Chief among the reasons for avoiding conflicts of interest is the preservation of the public's confidence in the integrity of lawyers and the judicial system. To allow a conflict to remain unaddressed until an affected party complains about the quality of justice he or she has received is to betray the public trust granted to the bar as a self-regulating organization.

The Court is charged with the duty and responsibility of supervising the conduct of attorneys who appear before it. *Kevlik,* 724 F.2d at 847; *Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85, 87 (9th Cir.1983); *United States v. Agosto,* 675 F.2d 965, 969 (8th Cir.), *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975). The Court is not unmindful of the recent practice indulged in by some to use disqualification motions for purely strategic purposes, *see, e.g., Smith v. Whatcott,* 757 F.2d 1098, 1099–1100 (10th Cir.1985); *Melamed v. ITT Continental Baking Co.,* 592 F.2d 290, 295 (6th Cir.1979); *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1289 (2d Cir.1975), and that courts should not be oblivious to this fact. Appropriately, the Fourth Circuit has cautioned against a mechanical application of the Virginia Code of Professional Responsibility to all situations.[4]

■ The Court is also aware that the disqualification of a party's chosen counsel is a serious matter which cannot be based on imagined scenarios of conflict. *See Richmond Hilton Associates v. City of Richmond,* 690 F.2d 1086, 1089 (4th Cir. 1982) ("actual or likely" conflict of interest required); *Aetna,* 570 F.2d at 1200 (where "practical considerations" eliminated any possibility of conflict, district court's hypothesis based on conjecture will not support granting motion to disqualify counsel). Thus, the moving party bears a "high standard of proof" to show that disqualification is warranted. *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978); *see also Evans v. Artek Systems Corp.,* 715 F.2d 788, 794 (2d Cir.1983).

■ The high standard of proof is fitting in light of the party's right to freely choose counsel, *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 753 (2d Cir.1975), and the consequent loss of time and money incurred in being compelled to retain new counsel. *See Government of India,* 569 F.2d at 737. However, this Court has held that the right of one to retain counsel of his choosing is "secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar." *In re Asbestos Cases,* 514 F.Supp. 914, 925 (E.D. Va.1981), *citing Silver Chrysler,* 518 F.2d at 757; *Hull v. Celanese Corp.,* 513 F.2d 568, 569 (2d Cir.1975); *Telos Inc. v. Hawaiian Telephone Co.,* 397 F.Supp. 1314 (D.Haw.1975). There must be a balance between the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community. *In re Asbestos Cases,* 514 F.Supp. at 914.

The Disciplinary Rules of the Virginia Code of Professional Responsibility are mandatory in character. The Rules state

---

4. In *Aetna Cas. & Sur. Co. v. United States,* 570 F.2d 1197 (4th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) the Court of Appeals quoted with approval the following language from *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1293 (2d Cir.1975) (the Second Circuit itself was quoting a passage from an *amicus curiae* brief filed by the Connecticut Bar Association):

It behooves this court, therefore, while mindful of the existing Code, to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring that client and the judicial system to sacrifice more than the value of the presumed benefits.

*Aetna,* 570 F.2d at 1202.

the "minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Preamble, Virginia Code of Professional Responsibility. Disciplinary Rule 5–105(A) states that in the absence of consent, "[a] lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment," and Section (D) adds that "[a] lawyer who has represented a client in a matter shall not thereafter represent another person in the same or substantially related matter if the interest of that person is adverse in any material respect to the interest of the former client . . . ." The relevant test under Disciplinary Rule 5–105(D) is whether the matters at issue in the PSA litigation are "substantially related" to the matters at issue in the present litigation.

The "substantially related" test was articulated in the seminal case *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265 (S.D.N.Y.1953) and adopted by most of the Circuit Courts of Appeal which have addressed the question of attorney disqualification in the successive representation context. *See Johnston v. Harris County Flood Control District,* 869 F.2d 1565, 1569 (5th Cir.1989); *Cox v. American Cast Iron Pipe Co.,* 847 F.2d 725, 728 (11th Cir.1988); *Kevlik v. Goldstein,* 724 F.2d 844, 850 (1st Cir.1984); *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983) ("a lawyer may not represent an adversary of his former client if the subject matter of the two representations is 'substantially related,' which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second."); *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570 (2d Cir.1973). It is a two-pronged test, the movant must establish both: (1) that an attorney-client relationship existed between the alleged former client,[5] and (2) that the former representation and the current controversy are

substantially related. *Allegaert v. Perot,* 565 F.2d 246, 250 (2d Cir.1977) ("before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonable have assumed the attorney would withhold from his present client."); *In re Chantilly Construction Corp.,* 39 B.R. 466, 469 (Bankr.E.D.Va. 1984). "Substantially related" has been defined to be "identical" or "essentially the same." *Government of India,* 569 F.2d at 739–40; *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.* 501 F.Supp. 326, 328–29 (D.D.C.1980).

Based on the arguments adduced and on the evidence presented, the Court finds that the PSA litigation, in which Hunton & Williams represented Dr. Magee and his "New Corporation," PSA, is substantially related to the instant action, in which Hunton & Williams represents PSSI.

Hunton & Williams asserts that the PSA litigation dealt solely with the use of Dr. Tessier's name on PSA letterhead and involved different time frames, different causes of action, different legal theories, and different parties. Therefore, they argue, it is not substantially related to this suit. The Court cannot agree.

Clearly the PSA litigation involved more than the misappropriation of Dr. Tessier's name. Dr. Tessier also sought an order requiring Dr. Magee and PSA to deliver the medical records of all the patients whom Dr. Tessier had treated while at PSSI. *Tessier v. Magee and Plastic Surgery Associates,* Civil Action No. 89–279–N (E.D.Va. Sept. 15, 1989) (Complaint paragraph 25). It was the express intention of Dr. Tessier to continue treating those patients. *Id.* at paragraphs 12–17. However, it was alleged that Dr. Magee and PSA deliberately undertook to terminate Dr. Tessier's relationship with those patients and deny him access to them. *Id.* at paragraph 18. The records were important for

---

5. There is no dispute that Dr. Magee and PSA are former clients of Hunton & Williams. Therefore, the only question before the Court is

whether the PSA litigation and the pending action are substantially related.

two reasons. The treatment of those patients would no doubt produce a not insignificant future income stream to whomever would be charged with the responsibility of their care.[6] Moreover, the records would reflect any inaccuracies, deliberate or innocent, in billing procedures prior to the PSSI's dissolution. In the present litigation, Dr. Tessier is using the same files to determine if he was fairly compensated for the work he performed on behalf of PSSI. These latter considerations underlie the present action. Furthermore, in determining the issue of removal of the name from the letterhead, it can be assumed that Mr. Stillman of Hunton & Williams would have discussed with Dr. Magee and his faction the nature and extent of the agreement between Dr. Tessier and the American doctors.

The two cases are substantially related in other respects. The parties in the PSA litigation are also parties, or potential parties, in the current litigation. Both suits are the byproducts of the dissolution of PSSI. More importantly, both suits are outgrowths of Dr. Tessier's professional relationship with Dr. Magee and PSA.[7] As former counsel for Dr. Magee and PSA, and present counsel for PSSI, Hunton & Williams will indubitably cross familiar ground in defending Dr. Tessier's claims and in defending against the Horton group's cross-claim.

While the legal theories employed in both cases are substantively different, the cases do arise from substantially similar facts. Confidential information conveyed in one case does not lose its confidential character because it was not utilized to develop a legal theory in a subsequent case. The information remains protected whether it is so used or not.

It is well settled that once an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter. *In re Chantilly Construction Corp.,* citing *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224 n. 3 (7th Cir.1978); *Allegaert v. Perot,* 565 F.2d 246, 250 (2d Cir.1977); *In re Asbestos Cases,* 514 F.Supp. 914, 921 (E.D.Va.1981). As counsel to PSSI, Dr. Magee and PSA, Hunton & Williams was in a position to receive confidential information from all former shareholders.

The court finds that the PSA litigation and the present action are "substantially related" and that, therefore, Hunton & Williams might have acquired information which may work to their former client's detriment; namely, Dr. Magee and PSA.

Hunton & Williams argues that even if the Court finds that the two cases are substantially related, the Court cannot grant the motion to disqualify because no "actual conflict" exists between the parties. Hunton & Williams relies on its analysis of two Fourth Circuit decisions interpreting sections of Disciplinary Rule 5–105. *See Aetna Casualty & Surety Co. v. United States,* 570 F.2d 1197 (4th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) and *Richmond Hilton Associates v. City of Richmond,* 690 F.2d 1086 (4th Cir.1982).

In *Aetna,* an insurance company which had paid claims arising out of an airplane crash brought suit, as subrogee, against the United States and the four air traffic controllers who were on duty at the time of the crash. The United States and the four controllers were represented by the Department of Justice until the district court granted Aetna's motion to disqualify government counsel on the ground that a potential conflict of interest existed between the United States and the individual

---

**6.** It is alleged that between November of 1983 and November of 1988, Dr. Tessier performed 163 surgical procedures in Norfolk in association with PSSI.

**7.** Although PSA is not a named defendant in the present action, it was a named defendant in the earlier action. Pursuant to the Agreement of Reorganization, any judgment against PSSI

caused by an individual shareholder will be satisfied by that shareholder's "New Corporation." In the case of Dr. Magee, that would be PSA. If the allegations of fraud against Dr. Magee contained in the Horton group's cross-claim are proven, and PSSI is also found to be liable, counsel for PSSI will have to look to PSA to satisfy any judgment.

controller defendants. In reversing the district court, the Fourth Circuit identified three "practical considerations" which should have entered into the disposition of the motion. First, there was "nothing in the record to support the conclusion of the court that an 'actual conflict exists.'" *Id.* at 1200. The appeals court stated that the mere existence of multiple defendants does not create a *per se* conflict of interest on the part of the attorney representing them. *Id.* at 1201. The district court could not hypothesize about possible contentions which might be made by each of the four controllers which would allow him to escape liability, but cast blame on his codefendants. *Id.* This is especially true, the Fourth Circuit added, in light of Government counsel's representation that "there was no dispute among ... [the controllers] either with respect to their duties and responsibilities or the details of the plane crash." *Id.*

Second, the Fourth Circuit found "that there is little or no possibility that the four controllers will incur any personal liability as a result of this litigation" by operation of the Tort Claims Act. *Id.* And, third, the Court noted that "if the government and the controllers should be held to be jointly liable, the individual defendants would not be required to pay the damages, since a judgment against the United States would automatically bar any contemporaneous or subsequent judgment against them." *Id. citing* 28 U.S.C. 2676.

■ Hunton & Williams reads *Aetna* to require a showing of an "actual conflict" before a motion to disqualify may be granted. The Court finds that this interpretation is too broad. An application of the "practical considerations" employed by the

*Aetna* court to the operative facts at bar yields a different result.

The "practical considerations" enumerated by the Fourth Circuit were, in effect, guarantees against an actual conflict ever arising. Similar guarantees do not exist in the present action. Here, there is fervent dispute among the defendants about who is responsible for the wrongdoing alleged by Dr. Tessier. Indeed, the detailed cross-claim filed by the Horton group charges defendants Dr. Magee, Dr. Jacobs, Mr. Bialkin and PSSI with fraud. The Horton group admits that Dr. Tessier was not compensated fully and fairly for his services. However, they strenuously deny responsibility for this shortfall and, instead, assert that co-defendants Dr. Magee and Mr. Bialkin are the culpable parties in this lawsuit. Unlike the *Aetna* defendants, the defendants at bar strongly contest the details of the events which led to the filing of this action.

Also unlike the *Aetna* defendants, the defendants here may incur personal liability as a result of the litigation. Dr. Tessier seeks to hold the defendants jointly and severally liable. Thus, each defendant has an incentive to cast blame on the others in order to escape liability. This creates the potential for actual conflict.

Finally, unlike the *Aetna* defendants who were shielded by 28 U.S.C. 2676, which prevented any recovery against them if the government was also found liable, a judgment against PSSI will also be a judgment against some or all of the individual defendants by operation of the Agreement of Reorganization. The Court finds that the guarantees against an actual conflict in the *Aetna* case are not present here. The potential for an actual conflict is greater here than in *Aetna* or *Richmond Hilton.*[8] If

---

8. A similar "practical considerations" analysis will distinguish *Richmond Hilton Associates v. City of Richmond,* 690 F.2d 1086 (4th Cir.1982). In that case the district court entered an order prohibiting a law firm from representing certain defendants, mostly public officials, in both their official and individual capacities, but permitting the firm to represent them solely in either capacity. In reversing, the Fourth Circuit noted that there was no conflict between the positions taken by the defendants sued in their official capacities and the defendants sued in both their individual and official capacities with respect to the defense of the lawsuit. In other words, "none of the defendants sued in his official capacity had asserted or intended to assert that the actions of those sued in their individual capacities were *ultra vires.*" *Richmond Hilton,* 690 F.2d at 1089. In the present action, it is obvious that the positions of the individual defendants differ in regard to the defense of the lawsuit.

Dr. Tessier is successful in his suit against PSSI, Hunton & Williams will be placed in the unseemly quandary of having to sue a former client for indemnification.

Although Mr. Stillman states that he only represents PSSI in this suit, the law is clear that an attorney's duty of loyalty to a client does not detach when litigation ends. *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157 (3d Cir.), *cert. denied, Cochrane and Bresnahan v. Plaintiff Class Representatives*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1984). The court recognizes a party's right to retain counsel of his choice, but as stated above, this right must be balanced against the duty of this court to preserve and enhance the public's perception of the fair administration of justice within the legal system. *In re Asbestos Cases*, 514 F.Supp. at 925. Hunton & Williams' prior representation of the interests of Dr. Magee and PSA could taint the appearance of fairness in this trial and, more importantly, taint the public perception of fairness in this court.

■ Notwithstanding the Court's interpretations of *Aetna* and *Richmond Hilton*, the Court finds that an actual conflict exists between Hunton & Williams and its clients in the current controversy. Mr. Stillman argues in his brief that his client PSSI is a defunct corporation with no assets except accounts receivable of undisclosed amount which by agreement between the eight individual defendants are being disbursed among the eight on the basis of a formula. Therefore, he maintains, no actual conflict can arise. Mr. Stillman states:

> Accordingly, PSSI is a defendant only in a technical sense. As a dissolved corporation, any liability it incurs will pass directly to its former shareholders. Indeed, pursuant to the Reorganization Agreement executed by the shareholders, all liability determined to have been caused by their specific acts or omissions falls squarely on the culpable shareholders whether it be Dr. Magee or Dr. Horton.

Filed letter to the court dated September 26, 1989.

It is clear from this statement that Mr. Stillman is in fact representing the interests individually of the eight shareholders who are each named defendants in this case and are also *de facto* defendants as the successors of the corporation. It is also clear that these defendants are in a position of conflict in respect to individual responsibility for the payment of any judgment which might be secured by the plaintiff.

As attorney for PSSI, Mr. Stillman will have charge of the strategy followed at the trial. He will have the right to expect the cooperation of all eight shareholders. He will determine what questions to ask of each shareholder concerning all of his relationships, dealings, conversations, agreements, billing procedures, etc., with the plaintiff. Much of the testimony elicited may bear on the ultimate question of culpability and responsibility for payment of any judgment which might be rendered against PSSI.

A completely neutral attorney who had no prior relationship with any of the stockholders would find it difficult to walk the tightrope and do the balancing act required in representing PSSI in this case. Mr. Stillman, who has already established an attorney-client relationship with one of the competing factions in this case in a matter substantially related to the issues in this case, is carrying so much extra baggage that a balanced and fair performance is virtually unobtainable. Additionally, three of Mr. Stillman's *de facto* clients (the Horton group) have unreservedly stated through their attorney that they feel that a conflict exists and that they do not want to be represented by Mr. Stillman. The Court is of the opinion that not only does the appearance of conflict exist but, in fact, an actual conflict exists.

Accordingly, the motion to disqualify Gregory Stillman and the law firm of Hunton & Williams GRANTED.

**The Motion to Disqualify Mr. Harlan and the Law Firm of Harlan and Associates**

Defendant Dr. Magee, by his counsel Mr. Shuttleworth, contends that the Virginia

Code of Professional Responsibility prohibits Mr. Harlan and the law firm of Harlan and Associates from representing the Horton group in the present action and, in the alternative, in the cross-claim that has been filed against Dr. Magee and others by the Horton group. Specifically, Dr. Magee alleges that Mr. Harlan's prior representation of PSSI and various individuals associated with PSSI during 1983 and 1984 prevents him from representing the Horton group in the instant matter. Such representation, it is argued, would be a form of impermissible successive representation within the meaning of Disciplinary Rule 5–105(D). Dr. Magee further argues that Mr. Harlan's position in the present action violates Canon 9 which states the axiom that a lawyer should avoid even the appearance of professional impropriety.

Mr. Harlan counters by stating that no attorney-client relationship ever existed between himself and PSSI and that, even if one did, the prior relationship and the instant case are not "substantially related." Applying the "substantial relationship" test as set out above, the Court finds that Mr. Harlan's prior relationship with PSSI is not substantially related to the instant action and, therefore, the motion to disqualify Mr. Harlan and the law firm of Harlan and Associates is DENIED.

In an affidavit filed with the court, Montgomery Knight, Esquire, a former partner of Mr. Harlan's in the law firm of Harlan, Knight, Dudley & Pincus, states that in July of 1983 Mr. Bialkin asked Mr. Knight to draft some personnel contracts for PSSI. Affidavit of Montgomery Knight, Esquire. Shortly thereafter a dispute arose between Mr. Bialkin and Mr. Knight. *Id.* Mr. Harlan investigated Mr. Bialkin's complaints and determined that it was in the law firm's best interests to discontinue representation of PSSI. First Affidavit of Mr. Harlan.

■ Mr. Harlan concedes that an attorney-client relationship existed between his former firm and PSSI. However, Mr. Harlan denies that an attorney-client rela-

tionship existed between himself and PSSI. The Court believes that Mr. Harlan cannot so easily segregate himself from the activities of his former firm. Although Mr. Knight's connection to PSSI was limited to the drafting of personnel contracts, First Affidavit of Thomas J. Harlan, Jr., and Mr. Harlan's connection to PSSI was even more tenuous, an attorney-client relationship nonetheless existed. As stated above, once an attorney-client relationship is established, an irrebuttable presumption arises that confidential information was conveyed to an attorney in the prior matter. *See In re Chantilly Const. Corp.*, 36 B.R. 466 (Bankr.1984), *citing Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 n. 3 (7th Cir.1978); *Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir.1977); *In re Asbestos Cases*, 514 F.Supp. 914, 921 (E.D.Va.1981). While the information may have been conveyed solely to Mr. Knight, this court has viewed with great skepticism the efficacy of a "Chinese Wall" which, in theory, prevents the communication of confidential information between members of the same firm. *See In re Asbestos Cases*, 514 F.Supp. at 922–26. Therefore, the Court finds that an attorney-client relationship existed between Mr. Harlan and PSSI.

■ Having determined that an attorney-client relationship between Mr. Harlan and PSSI, the Court must decide whether the matters on which Mr. Harlan represented PSSI are "substantially related" to the pending action. The Court finds that they are not. The arm's-length drafting of personnel contracts for PSSI six year's ago is not substantially related to litigation which involves an alleged fraudulent billing scheme. Dr. Magee, as the moving party, has failed to come forward with any evidence tending to show a nexus between the 1983–84 relationship and the instant suit. Finding no "substantial relationship" between the two matters, the Court hereby DENIES Dr. Magee's Motion to Disqualify Mr. Harlan and the law firm of Harlan and Associates. For the same reasons stated above, the Court also DENIES Dr. Magee's

alternative motion to disqualify Mr. Harlan and the law firm of Harlan and Associates from representing the Horton group in the cross-claim.[9]

Accordingly, for the reasons stated above, the motion to disqualify Gregory Stillman, Esquire and the law firm of Hunton & Williams in the pending action is GRANTED. The motion to disqualify Thomas J. Harlan, Jr., Esquire, and the law firm of Thomas J. Harlan and Associates is DENIED.

Mr. H. Leon Hodges, custodian of PSSI, shall promptly select new counsel and such new counsel shall promptly note an appearance with the Court.

---

**9.** Dr. Magee also asserts that Mr. Harlan and one or more of his current clients travelled to France to meet with Dr. Tessier with the objective of encouraging the initiation of this litigation. In his second affidavit filed with the court, Mr. Harlan admits to meeting with Dr. Tessier in Paris, France and the purpose of the meeting: "Because we needed to know who the patients were that Dr. Tessier had operated upon so that we could obtain their files and complete our investigation, it was necessary to meet with Dr. Tessier and to determine what patients he had operated on in Norfolk for the past four or five years. Thus, in September of 1988 while I was on vacation in Paris, I incidentally visited Dr. Tessier alone, without any physician with me at the time.... I had spoken to Dr. Tessier, explaining to him our difficulty created by Mr. Bialkin in obtaining records of [PSSI].... I asked him to furnish to us a list of all of his patients that he had operated on at that time so that we could further our investigation." Second Affidavit of Thomas J. Harlan, Jr. In light of the subject matter discussed between Mr. Harlan and Dr. Tessier, a reason-

able inference may be made that Dr. Tessier was much closer to filing a lawsuit when Mr. Harlan departed than when he arrived.

Disciplinary Rule 7–103 prohibits an attorney to communicate with a party of adverse interest. It states: "During the course of his representation of a client a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." Dr. Magee has presented no evidence showing that Dr. Tessier was represented by counsel at the time or that Mr. Harlan knew that Dr. Tessier was represented by counsel. More importantly, however, it is at best unclear as to whether the parties were in an adverse setting at this point in time. Considering that the conversation occurred in September of 1988 and that this suit was not filed until May 22, 1989, it is unlikely that the parties were of adverse interest. Accordingly, the court cannot find fault with Mr. Harlan's overseas tête-à-tête.