The NICHOLS AGENCY, INC.

v.

ENCHANTED CHILD CARE, INC.
d/b/a Celebree Learning
Centers.

Civil No. CCB–07–1757.

United States District Court,
D. Maryland.

Feb. 26, 2008.

Lawrence Joseph Quinn, Michael Thomas Ebaugh, Timothy Allen Hodge, Jr., Tydings and Rosenberg LLP, Baltimore, MD, for The Nichols Agency, Inc.

James B. Astrachan, Charles Francis Morgan, Astrachan Gunst and Thomas PC, Baltimore, MD, for Enchanted Child Care, Inc. d/b/a Celebree Learning Centers.

## *MEMORANDUM*

CATHERINE C. BLAKE, District Judge.

The Nichols Agency, Inc. ("Nichols") has sued Enchanted Child Care, Inc. d/b/a Celebree Learning Centers ("Celebree") for breach of contract, unfair competition and copyright infringement. Nichols alleges that Celebree was using Nichols-produced marketing works in violation of the terms of their agreement. Nichols has filed a motion to disqualify Celebree's attorneys for conflict of interest and Celebree has filed a motion to dismiss. For the reasons articulated below, Nichols's motion will be denied and Celebree's motion will be granted in part and denied in part.

## BACKGROUND

In October 2002, Nichols entered into an agreement ("the agreement") with Celebree to produce advertising and marketing products for Celebree, a string of day care centers. Under the agreement, Nichols was to serve as the "exclusive advertising/marketing consultant for all TV, Radio, Print, Magazine & Billboards, etc." (Compl. Ex. A.) Celebree was to pay a monthly "administrative/consulting fee" of $1,000, along with "15% of the gross monthly budget." The agreement noted that "[a]ll TV and Video production cost requires a minimum 50% deposit: 50% at completion" and that "[a]ll radio & print production cost may need to be paid in advance." The agreement provided that it could be cancelled by either party with thirty days' written notice.

As to the ownership of the creative works, the agreement stated that:

[Nichols] shall own all rights, title, interest, and copyright in and to ALL media & marketing campaigns, placement schedules, advertisement, scripts, copy, artwork, illustrations, graphic designs, and other products developed and created by us for you (hereinafter "Agency Works"). After termination of this agreement you shall have no further right to use, reproduce, distribute, display, or modify any Agency Works, except that you may distribute and display (without further reproduction) tangible copies of products, brochures, and posters you have paid for.

(Compl. Ex. A.)

During the course of their relationship, Nichols produced what it refers to as the "Nichols Works," which included a series of television commercials. In mid-to-late August 2004, Celebree notified Nichols that it intended to terminate the agreement. Nichols alleges that although the thirty-day termination notice was given in

August 2004, that "the parties understood and agreed that advertisements placed in August 2004 required Nichols to continue to provide its services to Celebree in billing, collecting, and managing the invoicing for such advertisements through October 2004," and that the earliest date on which termination could have been effective was October 31st.

Nichols alleges that after the agreement was terminated, Celebree continued to make unauthorized use of "the entirety of the Nichols Works" by "reproducing, publishing, and distributing [the Works] on its website, without permission or license." Nichols claims that it learned of the website's contents in November 2005 and attempted to extract payment from Celebree in exchange for the previous use of the commercials. Nichols continued in this vein until May 6, 2006, when Celebree "ceased its [allegedly] infringing use." Nichols also claims that Celebree never paid it for a corporate video which Nichols produced in late 2004, or for an advertising schedule which Celebree requested in early 2005.

In July 2007, Nichols sued for breach of contract, unfair competition and copyright infringement; it is seeking $61,500, plus interest and attorneys' fees, in damages for the breach of contract and unfair competition claims; $13,000, plus interest and attorneys' fees, in damages for breach of the agreement regarding the video; and a series of remedies at law and equity under the Copyright Act. Shortly thereafter, Celebree filed a motion to dismiss or, in the alternative, for summary judgment. In August, Nichols filed a motion to disqualify Celebree's counsel.

The facts supporting Nichols's motion for disqualification may be briefly stated. In February 2002, Nichols retained Donna M.D. Thomas ("Ms. Thomas") of Astrachan Gunst & Thomas, P.C. ("AGT") "for the purpose of legal advice and assistance in drafting agreements." (Pl's Mot. Disqualify 2.) According to Nichols, it gave Ms. Thomas the following tasks: redraft a form letter agreement which Nichols used with its customers; advise Nichols regarding "the misappropriation of advertisements by Nichols's customers"; and conduct settlement negotiations with one of Nichols's former customers. Nichols notes that the agreement, as redrafted by Ms. Thomas, provided the structure and much of the substance for the agreement it used with Celebree. Nichols learned in April 2006 that Celebree was represented by AGT, but did not file a motion for disqualification until approximately six weeks after filing suit. Nichols claims that the delay between its learning of Celebree's representation and the motion for disqualification is due to the fact that Celebree and Nichols were in settlement negotiations throughout that period. It was not until it became apparent there would be a lawsuit that Nichols raised the issue of a potential conflict of interest on the part of Ms. Thomas, and by extension, AGT.[1]

In support of its argument that no conflict exists, Celebree notes that AGT did not represent Nichols in any matters involving Celebree, that AGT did not gain any confidential information in the course of representing Nichols that could be adverse to Nichols in the current case, that the current dispute between Celebree and Nichols is factually distinct from the disputes involved in the previous representa-

---

**1.** Maryland Rule of Professional Conduct 1.10, the rule of imputed disqualification, states that none of the lawyers in a firm may represent a client if any of the lawyers in the firm is prohibited from such representation. Celebree concedes that if Ms. Thomas may not represent it, then all lawyers at AGT are similarly prohibited from doing so. (Def's Opp'n 2.)

tion, and that Nichols waited fifteen months to raise the issue of a potential conflict.

Celebree has moved to dismiss Nichols's complaint, on the following grounds: this court lacks subject matter jurisdiction to hear a Copyright Act claim for a work that has not been registered; the claim for breach of contract is preempted by the Copyright Act; and the claim for unfair competition is similarly preempted.[2] (Def's Mot. Dismiss 3.)

## ANALYSIS

*Motion for Disqualification*

■ This court applies the Maryland Rules of Professional Conduct ("MRPC") as they have been adopted by the Maryland Court of Appeals. Local Rule 704. MRPC 1.9, which details a lawyer's duties to former clients, states that:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) from whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

MRPC 1.9.

■ Disqualification of a party's attorney is

"a drastic remedy since it deprives litigants of their right to freely choose their own counsel." *Gross v. SES Americom, Inc.*, 307 F.Supp.2d 719, 722 (D.Md. 2004) (citing *Buckley v. Airshield Corp.*, 908 F.Supp. 299, 304 (D.Md.1995); *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir.1992)). At the same time, courts have a responsibility to "preserve the public's confidence in the judicial system." *Buckley*, 908 F.Supp. at 304. As a result, courts must find a " 'balance between the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community.' " *Id.* (quoting *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 729 (E.D.Va.1990)). Finally, the defendants bear "a high standard of proof to show that disqualification is warranted" because it is such a drastic measure. *Buckley*, 908 F.Supp. at 304 (quoting *Tessier*, 731 F.Supp. at 729).

---

**2.** At the motions hearing on February 6, 2008, Nichols voluntarily dismissed the unfair competition claim. As such, it is not discussed in this memorandum.

*Franklin v. Clark,* 454 F.Supp.2d 356, 364 (D.Md.2006).

Determining whether a conflict of interest exists requires a two-part analysis: first, "the moving party must establish that an attorney-client relationship existed with the former client," and second, "the matter at issue in the former representation [must be] the same or substantially related to that in the current action." *Stratagene v. Invitrogen Corp.,* 225 F.Supp.2d 608, 610 (D.Md.2002).

Here, there is no dispute that Ms. Thomas and Nichols formed an attorney-client relationship: in February 2002, after speaking with Brian Nichols on the phone and receiving two faxes from him, she had AGT run a conflict check on Nichols and the opposing party that he had mentioned; no conflict was revealed. Mr. Nichols signed an engagement letter, which he returned with a $400 retainer. Between February 2002 and August 2002, Ms. Thomas billed a total of 4.85 hours to the Nichols Agency on redrafting a form agreement and two small collection matters. (Def's Opp'n. Ex. M. at 4.)

The second step of the analysis involves a closer question: whether the issues in which Ms. Thomas represented Nichols are "substantially related" to the issues involved in the Nichols–Celebree dispute. "Substantially related" has been interpreted to mean "identical" or "essentially the same," *Tessier,* 731 F.Supp. at 730 (quoting *Gov't of India v. Cook Indus.,* 569 F.2d 737, 739–40 (2d Cir.1978)), or "factually related," *Blumenthal Power Co. v. Browning–Ferris, Inc.,* 903 F.Supp. 901, 902 (D.Md.1995) (quoting *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980)); *see also Buckley,* 908 F.Supp. at 305 (disqualifying the defendant's attorney on the ground that both the current and former representations involved the validity of the same patent). "[A] lawyer who recurrently handled a type of problem for a former client is not precluded for that reason alone from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." MRPC 1.9 cmt. 2. " '[S]ubstantially related' embraces consideration of circumstances where the same issue is litigated, albeit for a different client, if there is a substantial risk that confidential communications between the attorney and his or her former client may be disclosed or utilized in a material manner prejudicial to the former client." *Att'y Grievance Comm'n v. Siskind,* 401 Md. 41, 930 A.2d 328, 337 (2007) (quoting *Gatewood v. State,* 388 Md. 526, 880 A.2d 322, 332–33 (2005)).

Celebree argues that Ms. Thomas did not receive any confidential communications in the course of her representation; indeed, "[w]hatever information Mr. Nichols may have provided to Ms. Thomas about the terms of the form contract that he wanted her to draft for him would have been included in the terms of the contract." (Def's Opp'n 6.) Celebree notes Comment 3 to Rule 1.9, which states that "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation." (Def's Opp'n 8.)

However, "[b]y operation of law, [Ms. Thomas] is assumed to possess confidential information pertaining to [Nichols]" because she served as Nichols's attorney. *Siskind,* 930 A.2d at 338. Once an attorney-client relationship has been established, "an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter." *Id.* at 337 (quoting *Buckley,* 908 F.Supp. at 306). Furthermore, "[n]o actual receipt of confidences must be shown [because] such a standard would place an unreasonable burden on the moving par-

ty." *Stratagene*, 225 F.Supp.2d at 612 (quoting *Rogers v. Pittston Co.*, 800 F.Supp. 350, 354 (W.D.Va.1992)). The relevant question, therefore, is whether the confidential information which is assumed to have been shared in the previous representation could be used to the detriment of the former client in the current proceeding.

Here, the prior representation involved the following requests: that AGT redraft the form letter agreement that Nichols used with its clients; that AGT advise Nichols regarding a possible misappropriation of its creative works by clients; and that AGT reach an acceptable settlement with former Nichols clients. These matters are reflected in Ms. Thomas's billing records. (Def's Opp'n Ex. M.)

Ms. Thomas spent .6 hours in 2002 redrafting the form letter agreement;[3] the original version is included as defendant's exhibit D and the redlined copy is at exhibit E. The changes were not insubstantial. Ms. Thomas suggested the following edits: the addition of a clause imposing interest on outstanding charges and detailing how that interest was to be calculated; a provision that should Nichols have to send the account to collection, costs would be borne by the client; a clause specifying that the client is responsible for all third-party costs; an indemnification clause; and a paragraph stating that Nichols

> [s]hall own all right, title, interest and copyright in and to all scripts, copy artwork, illustration, graphic designs, marketing campaigns and other work product developed and created by us for you.... After termination of this agreement you shall have no further right to use, reproduce, distribute, display or modify any Agency Works, except that you may distribute and display (without further reproduction) tangible copies of brochures and posters you have paid for.

(Mot. Disqualify Ex. B.) Previously, Nichols's agreement had noted simply that "ALL creative ideas, created materials, media & marketing plans can only be used in agreement with our firm." (Def's Opp'n Ex. D.)

---

**3.** Nichols argues that AGT was aware, "both prior to and during" the attorney-client relationship, "that Nichols was in negotiations with Celebree," and that Nichols intended to use the redrafted form letter agreement with Celebree. (Pl's Reply 5.) This appears to contradict Mr. Nichols's statement in his affidavit that Celebree did not request marketing services from Nichols until after the form agreement was drafted. (Pl's Mot. Disqualify Ex. G, Nichols Aff. ¶¶ 3–5.) Ms. Thomas states that she does not recall Mr. Nichols ever having mentioned Celebree to her, (Def's Resp. Ex. 1, Thomas Aff. ¶ 15), and the firm did not run a conflict check on Celebree, as would have been the firm's practice had the name been raised. (*Id.*)

Given that Ms. Thomas redrafted the form letter agreement in March 2002, (Pl's Mot. Disqualify Ex. A), and the Nichols–Celebree agreement was not signed until October 2002, (Compl. Ex. A), it seems unlikely that the two were in negotiations prior to or during the redrafting. At the motions hearing, Nichols produced one document which it argues corroborates the claim that AGT was aware of the Nichols–Celebree negotiations: a letter from Brian Nichols dated December 28, 2001. The letter begins "Just want to say 'Thank You' for our most recent conversation regarding marketing & Advertising Celebree!" It makes several claims about what effect Nichols would have on Celebree's business and names several local businesses as clients. The letter concludes by noting that "[Mr. Nichols] will follow up with you around the 15th to coordinate schedules so that we may further discuss all of the services we can provide." Celebree countered that such letters are common in the advertising industry as tools to solicit new clients, and that nothing in the letter suggested that any negotiations had begun. The letter's sales tone and the fact that it fails to mention any specific commitments or interest on the potential client's part suggest that Celebree's characterization of the letter is correct.

Nichols himself made some significant and substantive changes to the agreement after Ms. Thomas redrafted it, however. The very first sentence of the Nichols–Celebree agreement refers to Nichols as the "exclusive advertising/marketing consultant"; Ms. Thomas's version only lists Nichols as "an advertising/marketing consultant." Counsel for Celebree pointed out at oral argument that the addition of "exclusive" meant that Nichols now had the ability to sue Celebree should Celebree use another company's services. The Thomas-drafted agreement also referred to a monthly consulting fee, which the Nichols–Celebree contract changed to a monthly "administrative/consulting" fee. That change is not unimportant for the proposed client, who under the Nichols–Celebree contract may be charged a fee for "administrative" costs regardless of whether Nichols performed any work that month. The Nichols–Celebree agreement also deletes a provision suggested by Ms. Thomas which would have created a non-exclusive license "to use and publish the Agency Works during the term of this agreement," leaving only the blanket prohibition discussed below. (Mot. Disqualify Ex. B.)

Celebree also points out, correctly, that the dispute before this court centers upon a provision which Ms. Thomas did not draft, and which Mr. Nichols inserted of his own accord. The Nichols–Celebree version states that "[a]fter termination of this agreement [Celebree] shall have no further right to use, reproduce, distribute, display, or modify any Agency Works, except that you may distribute and display (without further reproduction) tangible copies of *products*, brochures, and posters you have paid for." (Compl. Ex. A.) (emphasis added) The version drafted by Ms. Thomas states that after termination, Celebree "shall have no further right to use, reproduce, broadcast, distribute, display or modify any Agency Works, except that you

may distribute and display (without further reproduction) tangible copies of brochures and posters you have paid for." (Mot. Disqualify Ex. B.) In this case, Celebree argues that the commercial is a "product" that may be displayed after the agreement ends. Given that the crucial term to be interpreted was inserted not by Ms. Thomas, but by Mr. Nichols, it is unlikely that AGT's prior representation is substantially related to the current case.

Moreover, although the issues that Nichols presented to Ms. Thomas with regard to two Nichols clients (Salon by Debbie and Refacee) are facially similar to the allegations that Nichols now levels against Celebree (namely, that Refacee was using Nichols' created products in violation of the agreement (Def's Opp'n Ex. B), that Salon by Debbie was attempting to similarly use Nichols' works (Def's Opp'n Ex. A), and that Salon by Debbie had failed to pay certain amounts it owed Nichols (Def's Opp'n Ex. A)), AGT's previous involvement appears to be limited to a collection action. Ms. Thomas reached a settlement agreement with counsel for Salon by Debbie fairly quickly; it appears from the billing records that Ms. Thomas spent less than one hour over six days negotiating the agreement, which included payment only for Salon by Debbie's past due accounts, with Debbie's counsel. (See Def's Opp'n Ex. I, J.) Moreover, according to her affidavit, Ms. Thomas advised Nichols that she could not recommend any legal action with regard to Refacee. (Def's Opp'n Ex. 1 ¶ 3.)

■ There is no indication that, during the short-lived Nichols–Thomas relationship, Ms. Thomas had unfettered access to the Nichols files. Rather, it appears that her contact with Mr. Nichols consisted of a number of faxes, the contents of which are disclosed in the papers, and four phone calls. (See Def's Opp'n Ex. M.) Nichols

alleges there is a risk that during these phone calls, Nichols divulged its "litigation strategy"—information that AGT could now use against it. Nowhere in the pleadings or in Mr. Nichols's affidavit, however, is there any suggestion of what such a strategy might entail, or how discussion of that strategy is relevant to these cases. Nichols's claim to a generalized "strategy" with regard to litigation or settlement is not sufficient to disqualify opposing counsel. *See Blumenthal Power Co. v. Browning–Ferris*, 903 F.Supp. 901, 902 (D.Md. 1995) (rejecting an attempt to disqualify counsel that had advised the defendant regarding "overall corporate philosophy and strategy ... in litigation matters," and settlement strategies, and holding that the global character of the alleged confidences did not support a motion to disqualify). Accordingly, the motion to disqualify will be denied.

## Motion to Dismiss

■ Following the Supreme Court's ruling in *Bell Atlantic Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." 127 S.Ct. at 1965. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969 (quoted in *Goodman v. Praxair*, 494 F.3d 458, 466 (4th Cir.2007)). Moreover, the "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65.

■■ A two-step test must be applied to determine whether the claim for breach of contract is preempted by the Copyright Act, 17 U.S.C. §§ 101 *et seq. See United States ex. rel. Berge v. Bd. of Trs. Univ. Alabama*, 104 F.3d 1453, 1463 (4th Cir. 1997). First, it must be determined whether the commercials[4] fall " 'within the scope of the "subject-matter of copyright" as specified in 17 U.S.C. §§ 102, 103.' " *Id.* (internal citations omitted). Here, the commercials come within the scope of the Copyright Act because they are "original works of authorship fixed in any tangible medium of expression"; specifically, the commercials fall into the category of "motion pictures and other audiovisual works." 17 U.S.C. § 102(a). Moreover, the commercials were registered with the copyright office as of September 2006.[5] (See Compl. Ex. B.)

■ Second, it must be decided whether "the rights granted under state law" are "equivalent to any exclusive rights within the scope of federal copyright set out in 17 U.S.C. § 106." *Berge*, 104 F.3d at 1463 (internal quotations omitted). These federal rights include "the exclusive right to (1) reproduce the work, (2) prepare derivative works based on the work, [and] (3) distribute copies of the work." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir.1993) (citing 17 U.S.C. § 106). Any rights granted under a state cause of action must require a

---

4. In its motion to dismiss, Celebree argued that the complaint referred only to the "Nichols Works" and was not sufficiently specific as to which works were claimed under the Copyright Act. At the motions hearing, Nichols clarified that only the commercials, and no other materials, are the subject of the copyright and breach of contract claims.

5. The date of registration is listed as September 26, 2006, (Compl. Ex. B), and Nichols filed its complaint on July 3, 2007. Accordingly, Celebree's motion to dismiss Count IV on the ground that this court lacks subject matter jurisdiction over the claims, (Def's Mot. Dismiss 5), will be denied.

separate element in addition to those required for the Copyright Act; moreover, that extra element must make the nature of the state claim qualitatively different from copyright infringement. *Rosciszewski v. Arete Assoc.,* 1 F.3d 225, 229–30 (4th Cir.1993).

A breach of contract claim will survive preemption only when the cause of action is based upon provisions of the contract outside the subject matter of copyright.[6] *Acorn Structures, Inc. v. Swantz,* 846 F.2d 923, 926 (4th Cir.1988). A claim ordinarily would not survive, for example, where the essential claim is that the defendant misappropriated the plaintiff's materials. *See Miller v. CP Chemicals, Inc.,* 808 F.Supp. 1238, 1245–46 (D.S.C.1992) (citing *Patsy Aiken Designs, Inc. v. Baby Togs, Inc.,* 701 F.Supp. 108, 110 (E.D.N.C. 1988)). "The state law right 'is equivalent to one of the rights comprised by a copyright if it is infringed by the mere act of reproduction, performance, distribution, or display.'" *Fischer v. Viacom Int'l,* 115 F.Supp.2d 535, 541 (D.Md.2000) (quoting *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 677 (7th Cir.1986)).

In this case, the crux of Nichols's breach of contract claim appears to be that Celebree displayed its commercials without permission. The complaint makes that clear; it alleges, in count one, that "Celebree [ ] had an obligation to cease making use of the Nichols Works after termination of the Agreement," and that "Celebree's continued use of the Nichols Works after the Termination Date, without authorization from Nichols, is a material breach of contract." (Compl. ¶¶ 33, 34.) This allegation is substantively similar to that contained in the Copyright Act claim, which alleges that Celebree had "knowingly and willfully infringed Nichols's copyrights by reproducing, publishing, and distributing registered Nichols Works on its website without authorization from Nichols." (Compl. ¶ 52.)

Nichols attempts to align this case with both *Lowry's Reports v. Legg Mason, Inc.,* 186 F.Supp.2d 592 (D.Md.2002), and *Acorn Structures,* 846 F.2d 923. Those cases are distinguishable. In *Lowry's Reports,* the subscription contract "essentially establishe[d] a private law governing fair use of the copyrighted works *inter partes,* which makes the claim qualitatively different from a simple copyright case, in which there is no 'private law' defining what is and is not fair use of the work." 186 F.Supp.2d at 594–95. Among the conditions of the subscription contract was a provision in which Legg Mason agreed "not to disseminate or furnish to others, including associates, branch offices, or affiliates, the information contained in any reports issued by Lowry's Reports, Inc., without consent." *Lowry's Reports v. Legg Mason, Inc.,* 271 F.Supp.2d 737, 756

---

**6.** At oral argument, counsel for Nichols cited *Lennon v. Seaman,* 63 F.Supp.2d 428, 437 (S.D.N.Y.1999), for the proposition that courts generally have held the Copyright Act does not preempt actions for breach of contract. This does not appear to be true within the Fourth Circuit, as there are many instances in which courts have concluded that a state law action for breach of contract was so preempted. *See Madison River Mgt. Co. v. Business Mgt. Software Corp.,* 351 F.Supp.2d. 436, 443–44 (M.D.N.C.2005) (holding that an implied promise to pay was not sufficient to avoid preemption); *Brown v. McCormick,* 23 F.Supp.2d 594, 608 (D.Md.1998) (holding that because the plaintiff was attempting "to vindicate the same right" that she pursued through the Copyright Act, the contract claim was preempted); *Wharton v. Columbia Pictures Industries, Inc.,* 907 F.Supp. 144, 146 (D.Md.1995) (holding that breach of contract claim was "equivalent" because it "concern[ed] the central allegation that Defendants plagiarized [the plaintiff's] copyrighted screenplay.").

(D.Md.2003). The *Acorn Structures* case is similarly instructive as to what contract provisions are qualitatively different from copyright law. In that case, the "design contract" at issue provided for the performance of architectural services; the agreement "did not commit Swantz to purchase building materials from Acorn," but established that the money paid for the architectural services could be credited toward building materials. 846 F.2d at 924–25. The agreement further provided for a $100 refund if Swantz decided not to purchase the building materials-so long as he returned the design drawings. The Fourth Circuit held that implicit within the contract "was an agreement that while Swantz did not have to use Acorn's plans, if he did use Acorn's plans then he was obligated either to purchase the plans from Acorn or to purchase his building materials from Acorn." *Id.* at 926. Because Acorn's breach of contract claim arose from this provision, which did not "arise out of the subject matter of copyright," it was a "separate and distinct cause of action," and was not preempted by the federal law. *Id.; cf. Madison River Mgt. Co.,* 351 F.Supp.2d at 443–44 (noting that, unlike Acorn Structures, the agreement at issue did not contain a promise to pay for excessive copying, and holding that an implied promise not to use another's ideas without paying for them was not sufficient to uphold state law action).

Here, the part of the contract from which this dispute arises contains no such implicit provisions or private law. Nichols is correct to point out that the agreement "governs the terms under which Nichols will provide certain advertising and marketing services to Celebree, including by specifying the price and payment terms for such services, the term of the engagement, the process for termination of the Agreement, attorneys' fees for breach of the Agreement, certain indemnifications by Celebree, and the rights of third-parties." [7] (Pl's Opp'n 11.) The breach of contract claim, however, stems only from the provision that "[a]fter termination of this agreement," Celebree "shall have no further right to use, reproduce, distribute, display, or modify any Agency Works" without Nichols's "consent and agreement to do so." (Compl. Ex. A.)

## CONCLUSION

For the foregoing reasons, Nichols's motion to disqualify counsel will be denied, and Celebree's motion to dismiss will be granted in part and denied in part. A separate Order follows.

## ORDER

In accordance with the foregoing Memorandum, it is hereby ORDERED that:

1. Enchanted Child Care, Inc. d/b/a Celebree Learning Centers' Motion to Dismiss (docket entry no. 7) is **GRANTED** as to count I and **DENIED** as to count IV;

2. Count I is dismissed, except as to the claim for $2,449.85 for services rendered and late fees;

3. Count III is voluntarily dismissed; and

4. The Nichols Agency's Motion to Disqualify Counsel (docket entry no. 13) is **DENIED.**

---

7. Celebree notes, correctly, that the remainder of Count I—a claim for $2,449.85 for services rendered and late fees (Compl. ¶¶ 30–31)—is a breach of contract separate and apart from the claim for "continued use . . . after the Termination Date," (Compl. ¶¶ 33–37) and that the survival of the former claim does not preclude preemption of the latter claim.