William **CAPACCHIONE, Individually and on Behalf of Cristina Capacchione, a Minor, Plaintiff,**

v.

**CHARLOTTE–MECKLENBURG BOARD OF EDUCATION, et al., Defendants.**

James E. **SWANN, et al., Plaintiffs,**

v.

**THE CHARLOTTE–MECKLENBURG BOARD OF EDUCATION, et al., Defendants.**

Nos. 3:97CV482–P. Civ.A.No. 1974.

United States District Court, W.D. North Carolina, Charlotte Division.

April 20, 1998.

John O. Pollard, Kevin V. Parsons, McGuire, Woods, Battle & Boothe, L.L.P., Charlotte, NC, William S. Helfand, Stephen A. Katsurinis, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, P.L.L.C., Houston, TX, Lee Meyers, Meyers & Hulse, Charlotte, NC, for William Capacchione.

Anita S. Hodgkiss, James E. Ferguson, Luke Largess, Ferguson, Stein, Wallas, Gresham & Sumter, P.A., Charlotte, NC, Adam Stein, Ferguson Stein Wallas Adkins, Gresham & Sumter, Chapel Hill, NC, Elaine Jones, Norman J. Chachkin, Gloria J. Browne, NAACP Legal Defense & Educational Fund, Inc., New York City, NY, for Swann.

James G. Middlebrooks, Irving M. Brenner, Smith, Helms, Mulliss & Moore, LLP, Charlotte, NC, Allen R. Snyder, Kevin J. Lanigan, Maree Sneed, Hogan & Hartson, L.L.P., Washington, DC, Leslie J. Winner, Charlotte–Mecklenburg Board of Education, Charlotte, NC, for Charlotte–Mecklenburg Schools.

James G. Middlebrooks, Irving M. Brenner, Smith, Helms, Mulliss & Moore, LLP, Charlotte, NC, Allen R. Snyder, Kevin J. Lanigan, Maree Sneed, John W. Borkowski, Hogan & Hartson, L.L.P., Washington, DC, Leslie J. Winner, Charlotte–Mecklenburg Board of Education, Charlotte, NC, for The Board of Education of Charlotte–Mecklenburg.

James G. Middlebrooks, Irving M. Brenner, Smith, Helms, Mulliss & Moore, LLP, Charlotte, NC, Allen R. Snyder, Kevin J. Lanigan, Maree Sneed, Hogan & Hartson, L.L.P., Washington, DC, for Susan Burgess,

Chair of the Charlotte–Mecklenburg School Board, Eric Smith.

A. Lee Parks, Kirwan, Parks, Chesin & Miller, P.C., Atlanta, GA, Thomas J. Ashcraft, Charlotte, NC, for Michael P. Grant, Richard Easterling, Lawrence Gauvreau, Karen Bentley, Charles Thompson, Scott C. Willard.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on the Motion of John O. Pollard, Kevin V. Parsons, and Blakeney & Alexander, now practicing as McGuire Woods, Battle & Boothe, L.L.P. (hereinafter "McGuire Woods") for Leave to Withdraw as Counsel for the Plaintiffs ("Motion to Withdraw") [document no. 19, filed on 19 February 1998] and the Defendants' Statement of Position on Motion for Leave to Withdraw and Alternative Motion to Disqualify ("Motion to Disqualify") [document no. 29, filed on 23 March 1998]. For the reasons enunciated *infra*, the Court will deny the Motion to Withdraw and the Motion to Disqualify.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Capacchione retained Pollard and Parsons as local counsel in this litigation on or about 22 August 1997 when Pollard and Parsons were associated with the Charlotte law firm of Blakeney & Alexander. Capacchione is also represented by William S. Helfand, Esq., Magenheim, Bateman, Robinson, Wrotenbery & Helfand, P.L.L.C., of Houston, Texas and Lee Meyers, Esq., Meyers and Hulse, of Charlotte, North Carolina. On or about 1 January 1998, the law firm of McGuire Woods, a law firm based out of Richmond, Virginia, merged with Blakeney & Alexander.

In the Fall of 1996, and prior to Blakeney & Alexander and McGuire Woods initiating merger discussions, James W. Dyke, Jr., a partner with McGuire Woods, contacted Dr. Eric Smith, Superintendent of the Charlotte–Mecklenburg School District, and engaged in discussions concerning the same subject.

During the course of those conversations, Dr. Smith allegedly provided information to Mr. Dyke pertinent to the subject of this litigation. While Dyke has not shared the information with the Blakeney & Alexander lawyers, the details of Dyke's discussions have been shared with counsel for the Defendants and the Defendants have advised that they regard the continued representation of Capacchione by Pollard and Parsons, now a partner and associate, respectively, in McGuire Woods, as a conflict.

Accordingly, citing Rule 5.11 of the Rules of Professional Conduct of the North Carolina State Bar (now Rule 1.10 of the Revised Rules of Professional Conduct of the North Carolina State Bar ("Revised Rules")), and with very little discussion, Pollard and Parsons, and Blakeney & Alexander, now practicing as McGuire Woods, believe imputed disqualification may operate to prevent them from representing Capacchione in these matters and, accordingly, moved the Court for leave to withdraw as counsel.

For their part, Defendants Charlotte–Mecklenburg Board of Education ("CMBOE"), Arthur Griffin, Jr., and Dr. Eric Smith (collectively, the "Defendants") support the Motion to Withdraw, and, alternatively, move the Court to disqualify McGuire Woods. Defendants cite to Rules 1.6, 1.7, and 1.10 of the Revised Rules and to the transcript of the testimony of Mr. William Broaddus, partner and member of McGuire Woods's conflict committee, and, without discussion, conclude that McGuire Woods should be allowed to withdraw or, alternatively, disqualified.

The Court first took up the Motion to Withdraw at a hearing on another matter held on 5 March 1998 at which all the attorneys for the parties were present.[1]

Mr. Helfand, on 4 March 1998, filed a Statement of Position on the Motion to Withdraw in which he requested that the Court closely scrutinize the specific facts and circumstances underlying the Motion in which he submitted that no lawyer of the firm of McGuire Woods provided any substantive legal services to CMBOE which would require withdrawal of counsel based upon representation of Capacchione in this case under the Rules of Professional Conduct of the North Carolina State Bar.

On 23 March 1998, the Defendants filed their Motion to Disqualify.

The Court held a hearing on the Motions on 27 March 1998 in which all parties were present, and Dr. Smith and attorneys Dyke, Pollard and Parsons testified under oath.[2]

### FINDINGS OF FACT

After viewing the witnesses and hearing the evidence presented at the 5 March Hearing and the 27 March Hearing and considering the briefings of the parties, the Court makes the following findings of fact:

1. Dr. Smith contacted Dyke in the Fall of 1996 for the purposes of having Dyke present a briefing on the updates in the law of school desegregation and unitary school systems since the Supreme Court's decision in *Swann* in 1971. The briefing was to be educational in nature, and Dyke was not to give legal advice concerning whether the Charlotte–Mecklenburg school system was unitary or what actions the CMBOE should take regarding school desegregation. (Tr. p. 37, lines 8–25, p. 38, line 25; p. 39, lines 1–24; p. 15, lines 3–9; p. 16, lines 24–25; p. 17, lines 1–25; p. 18, lines 1–24.)

2. Dyke was to present a briefing to CMBOE in January of 1997 in response to Dr. Smith's and the CMBOE's request. (Tr. p. 23, lines 20–25; p. 24, lines 1–5.)

3. When he had his conversation with Dr. Smith, Dyke was not aware of the *Capacchione* matter because it had

---

1. The main purpose of the 5 March 1998 Hearing was to hear the parties on the Defendants' Motion to Dismiss and the *Swann* Plaintiffs' Motion to Reopen. At this hearing, Broaddus testified regarding his understanding of the potential conflict.

2. Citations to transcript will refer to the hearing held on 27 March 1998.

not yet been filed. Dyke was aware of the existence of *Swann* as he remembered it from law school, and he was aware that the Court had not declared the school system unitary. (Tr. p. 23, lines 20–25; p. 24, lines 1–7.)

4. The *Capacchione* lawsuit had not been filed when Dyke addressed the CMBOE. (Tr. p. 24, lines 1–5.)

5. The *Swann* suit had been remanded from the active court calendar by Judge James B. McMillan on July 11, 1975 (67 F.R.D. 648).

6. The *Swann* case was not reopened until this Court granted the Swann Plaintiffs' Motion to Reopen on 5 March 1997. (Tr. 5 March 1998 Hearing, p. 29, lines 6–14.)

7. The discussions between Dr. Smith and Dyke addressed the general state of the law with respect to desegregation and unitary school systems. Dr. Smith and Dyke did not discuss the specific facts related to the situation in the Charlotte–Mecklenburg school district. Dr. Smith made it clear that McGuire Woods was to speak generally about the issue of desegregation and unitary status, and that McGuire Woods would not attempt in any way to relate or apply the current status of the law to the facts in the Charlotte–Mecklenburg school system. (Tr. p. 15, lines 3–9.) [3]

8. Dr. Smith imparted information to Dyke about the school system in general and about the CMBOE. (Tr. p. 9, lines 7–22). That information helped Dyke to give a better presentation to the CMBOE. (Tr. p. 10, lines 21–24.)

9. Dr. Smith did not discuss with Dyke matters related to the *Capacchione* matter because that matter was not in existence at that time. (Tr. p. 12, lines 3–5.)

10. Through the briefing, Dyke's intention was to present to the CMBOE the current state of the law with re-

spect to desegregation and the factors considered and the determination whether a school system is unitary. (Tr. p. 17, lines 4–6.)

11. McGuire Woods represented Dr. Smith, in his personal capacity, during contract negotiations on two prior occasions: one in Virginia, and one in Charlotte. (Tr. p. 36, lines 14–19.)

12. McGuire Woods represented Dr. Smith in his official capacity on one occasion when Dr. Smith was working in Virginia. The representation was regarding the dismissal hearing of a school employee. (Tr. p. 36, lines 14–25; p. 37, line 1.)

13. Dr. Smith sought Dyke because in August of 1996 Dr. Smith had started as superintendent at the CMBOE and was heavily involved in student reassignment at the time and he felt that it would be useful to get some briefing as to the kind of history on a general level that has evolved in the federal courts since *Swann* and try to do that in a way that had information brought to the Board from outside sources from Charlotte. This was general information for the Board retreat. At that time he had not had discussions with the Board members about the question of whether the school system had achieved unitary status. (Tr. p. 37, lines 12–25; p. 38, lines 1–4.)

14. Dr. Smith picked Dyke because he wanted a firm that was not immersed in local history, and could therefore give a broader national perspective "and not have history here locally." Dr. Smith knew Dyke from his time as Secretary of Education in Virginia and he felt that Dyke could give a national perspective without having the local history. (Tr. p. 38, lines 5–10.)

15. Dr. Smith testified that he gave Dyke information that he considered to be confidential. The "confidential" information "revolved around trying the

---

**3.** All references to the Transcript are to the March 27, 1998 hearing unless otherwise noted.

[sic] set the context for the retreat so that Dyke and his firm could do an effective job in describing the changes in the law over the years. So it pertained to a variety of issues related to the Charlotte–Mecklenburg School System and the Board and its administration." (Tr. p. 39, lines 10–20.)

16. Dr. Smith did not give Dyke his assessment of where he, the Board as a whole, or the individual board members were on the question of unitary status. "Again it was not that specific." (Tr. p. 39, lines 21–24.)

17. Dr. Smith did not tell Dyke facts that he considered were important to determination of unitary status. His conversations with Dyke were of a more general nature. (Tr. p. 39, line 25; p. 40, lines 1–3.)

18. Dr. Smith asked Dyke to be part of the retreat because he was an attorney. The sum total of Dr. Smith's request was to receive an update on the developments in the law and the current status of the law in the nation regarding the issue of desegregation in the schools and unitary school systems. (Tr. p. 40, lines 21–25; p. 41, lines 6–11.)

19. It was Dr. Smith's judgment, not CMBOE's, as to which issues Dyke should address. (Tr. p. 43, lines 1–15.)

20. Dr. Smith did not give Dyke any information that was not a matter of public record. Moreover, any member of the public could readily obtain such information by simply surveying the open records of the School District (Tr. p. 42, lines 2–8.)

21. Dyke, as a member of the law firm of McGuire Woods, presented a briefing to the CMBOE in January of 1997. (Tr. p. 7, lines 8–9.)

22. The briefing did not include anything specific about the *Capacchione* case (which was not in existence at the time) or the *Swann* case. The briefing was educational in nature, and addressed, in general, unitary school systems and school desegregation and the changes in the federal law since the *Swann* decision in 1971. (Tr. p. 7, lines 13–21; p. 11, lines 16–25; p. 12, lines 1–5.)

23. The presentation was made at a conference room at the Charlotte–Douglas Airport and there were people other than the CMBOE present. In fact, there were members of the media as well as other members of the CMBOE staff. (Tr. p. 17, lines 7–11.)

24. Dyke or one of his associates at the presentation specifically advised the members of the CMBOE that McGuire Woods could not, and would not, offer legal advice on the status of the Charlotte–Mecklenburg School District with respect to the issues that were being spoken of that day. Dyke and his associates made it clear that they were speaking generally to the state of the law nationally and were not in any way trying to relate that law to the facts in the Charlotte–Mecklenburg County school system, and the purpose of the briefing was merely to educate the School Board on the state of the law with respect to this particular subject. (Tr. p. 17, lines 21–25, p. 18, lines 1–12.)

25. Dyke did not give the CMBOE legal advice as to how the update in the law might apply to the CMBOE and the Charlotte–Mecklenburg school system. (Tr. p. 18, lines 19–24.)

26. Neither Dyke nor McGuire Woods have ever represented CMBOE in any matter at all. (Tr. p. 7, lines 22–25.)

27. Regarding his conversations with Dr. Smith, Dyke has not discussed the content of those conversations with either Pollard or Parsons. (Tr. p. 8, lines 2–5.)

28. Neither Pollard nor Parsons have learned from Dyke or anyone else the content of the conversations between Dr. Smith and Dyke. (Tr. p. 19, lines 1–5.)

29. The *Swann* Plaintiffs moved that the *Swann* case be reopened, and the Court granted the *Swann* Plaintiffs' Motion to Intervene in *Capacchione* and stated that the Court would entertain a motion by Capacchione to intervene in the *Swann* case. (Tr. 3/5 Hearing, p. 29, lines 6–15.)

30. Pollard has never been privy to any information that may have been discussed between Dyke and Dr. Smith. (Tr. p. 29, lines 6–17.)

31. Pollard feels he can adequately represent Mr. Capacchione without being privy to the information that may have been discussed between Dr. Smith and Dyke. (Tr. p. 29, lines 18–25.)

32. As in Pollard's case, Parsons has not been privy to any information that may have been discussed between Dyke and Dr. Smith in this case or the *Swann* case. (Tr. p. 32, lines 4–9.)

33. Parsons feels he can adequately represent Mr. Capacchione without being privy to the information that may have been discussed between Dr. Smith and Dyke. (Tr. p. 32, lines 10–16.)

## II. ANALYSIS

In the Motion to Disqualify, the Defendants moved to disqualify McGuire Woods for the same reasons Pollard and Parsons moved to withdraw. In their Motion to Withdraw, counsel contend that they are ethically obligated to withdraw from this matter

4. Rule 1.6, which defines and regulates the confidentiality of information, provides in pertinent part:

 (a) "Confidential information" refers to information protected by the attorney-client privilege under applicable law, and other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client. For the purposes of this rule, "client" refers to present and former clients.
 N.C.Rules Prof. Conduct 1.6(a).

5. Rule 1.7, which defines and regulates conflicts of interest provides in pertinent part:

due to the existence of a conflict in violation of Rules 1.6(a), 1.7(c), and 1.10(a) of the Revised Rules.

Specifically, counsel maintain that information obtained by Dyke, a member of McGuire Woods, obtained in private conversations with Dr. Smith, the Superintendent of the CMBOE, is confidential information as defined by Rule 1.6(a).[4] Next, they aver that Dyke would have a conflict of interest in representing Capacchione in this matter, as defined by Rule 1.7(c),[5] because of the information Dr. Smith provided to Dyke. Finally, the argument goes, because Dyke would be prohibited from representing Capacchione, Rule 1.10[6] prohibits Pollard and Parsons from representing Capacchione because the attorneys are currently associated in the same law firm.

The Court will first address the Motion to Disqualify.

### A. MOTION TO DISQUALIFY

■■■ A motion to disqualify an attorney is addressed to the discretion of the trial court. *Plant Genetic Systems, N.V. v. Ciba Seeds*, 933 F.Supp. 514, 517 (M.D.N.C.1996) (citations omitted). In ruling on a motion to disqualify, a trial court applies a two-part test. The moving party must establish that: (1) an attorney-client relationship existed with the alleged former client; and (2) the former representation is substantially related to the current controversy. *Id., see also Rogers v. Pittston Co.*, 800 F.Supp. 350, 353–54 (W.D.Va.1992).

 (c) A lawyer shall have a continuing obligation to evaluate all situations involving potentially conflicting interests, and shall withdraw from the representation of any party the lawyer cannot adequately represent without using the confidential information of another client or a former client except as Rule 1.6 allows.
 N.C.Rules Prof. Conduct 1.7(c).

6. Rule 1.10 states that:

 (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9, or 2.2.
 N.C.Rules Prof. Conduct 1.10(a).

[3, 4] A court must apply this two-part test in the context that disqualification is a drastic remedy. *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir.1992).[7] Thus, the moving party has a very high standard of proof in moving to disqualify an opposing party's counsel. *Id.* It follows that a court should not disqualify a party's chosen counsel on imagined scenarios of conflict. *Aetna Casualty & Surety Co. v. United States*, 570 F.2d 1197, 1200 (4th Cir.1978).

■ It is true that in a close case the trial court should not engage in "hair-splitting" niceties and resolve doubts in favor of disqualification. Nevertheless, this Court is mindful of the Court of Appeals for the Fourth Circuit's clear statement that courts should not mechanically apply ethical canons; rather, they should decide disqualification issues on a case-by-case basis:

> The drastic nature of disqualification requires that courts avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel; and that they always remain mindful of the opposing possibility of misuse of disqualification motions for strategic reasons.

*Shaffer*, 966 F.2d at 146.[8] This is so because no ethical canon can be an all-encompassing bright-line rule that will easily apply to all circumstances no matter the facts of the individual case. *Smith v. Bryant*, 264 N.C. 208, 210, 141 S.E.2d 303 (1965).

■ The Court also recognizes that a party's right to have counsel of its choosing is a fundamental tenet of American jurisprudence, and therefore a court may not lightly deprive a party of its chosen counsel. *United States v. Smith*, 653 F.2d 126, 128 (4th Cir.1981) (citing *Powell v. Alabama*, 287 U.S.

45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932) ("It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.")). Finally, the ultimate purpose of granting a motion to disqualify counsel is to eliminate the threat that the litigation will be tainted; therefore, the guiding principle for a court considering a motion to disqualify counsel is safeguarding the integrity of the court proceeding. *Ciba Seeds*, 933 F.Supp. at 517; *Rogers v. Pittston*, 800 F.Supp. 350 (W.D.Va.1992), *aff'd*, 996 F.2d 1212 (4th Cir.1993). Hence, when ruling on a motion to disqualify counsel, in addition to the two-part test a court must weigh and balance several factors: the important right of a party to retain its chosen counsel and the substantial hardship which may result from disqualification against the public perception of and trust in the judicial system. *Shaffer*, 966 F.2d at 146 ("These are practical considerations that we must take into account, along with a party's ability to secure alternative representation, in assessing the propriety of disqualifying counsel on "likely" conflict grounds.") (quoting *Aetna*, 570 F.2d at 1200–02); *Ciba Seeds*, 933 F.Supp. at 517 (citations omitted).

### 1. *Attorney–Client Relationship*

■ The Court will first address whether there was an attorney-client relationship between the Superintendent or the CMBOE and attorney Dyke. After reviewing the parties' briefs, and viewing the witnesses and the evidence in two evidentiary hearings, the Court is convinced that Dr. Smith did not disclose any confidential information to McGuire Woods. In addition, there was not an attorney-client relationship between Dr.

---

7. *See also Ciba Seeds*, 933 F.Supp. at 517; *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 729 (E.D.Va.1990).

8. *Citing Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir.1976); *see also Ciba Seeds*, 933 F.Supp. at 517. *Buckley v. Airshield Corp.*, 908 F.Supp. 299, 307 (D.Md.1995).

 In *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197 (4th Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) the Court of Appeals quoted with approval the following language from *International Electronics Corp. v.*

*Flanzer*, 527 F.2d 1288, 1293 (2d Cir.1975): "It behooves this court, therefore, while mindful of the existing Code, to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring that client and the judicial system to sacrifice more than the value of the presumed benefits." *Aetna*, 570 F.2d at 1202.

Smith as Superintendent of the School Board and the law firm of McGuire Woods.

The Revised Rules of Professional Conduct adopted by the Council of the North Carolina State Bar April 4, 1997 and approved by the North Carolina Supreme Court on July 24, 1997, Rule 1.6(a) provides:

Rule 1.6 Confidentiality of Information

(a) "Confidential information" refers to information protected by the attorney-client privilege under applicable law, and other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client. For the purposes of this rule, "client" refers to present and former clients.

After hearing the witnesses and parties, and reviewing the evidence, the Court determines that Dr. Smith did not reveal any confidential information to Dyke or anyone else. The following findings of fact support this determination:

1. Neither Dyke nor McGuire Woods has ever represented the CMBOE or the Superintendent of the CMBOE in any matter. (Finding of Fact "FF" no. 26.)

2. Dr. Smith picked Dyke because he wanted a firm that was not immersed in local history, and could therefore give a broader national perspective "and not have history here locally." Dr. Smith knew Dyke from his time as Secretary of Education in Virginia and that felt he could do a good job at that. (FF no. 14.)

3. The conversations between Dr. Smith and Dyke occurred in the Fall of 1996. (FF no. 1.)

4. The *Swann* case was not reopened until this Court granted the Swann Plaintiffs' Motion to Reopen on 5 March 1997. (FF no. 6.)

5. Dr. Smith requested that Dyke present a briefing of a general overview of the development of the law of school desegregation and unitary school systems since the Supreme Court's decision in *Swann* in 1971. (FF no. 1.)

6. Dyke's only activity was to give a briefing which was educational in nature, and addressed, in general, unitary school systems and school desegregation and the changes in the federal law since the *Swann* decision in 1971. It did not specifically address the facts regarding the unitary status of the Charlotte–Mecklenburg school district. (FF nos. 1, 21, 22.)

7. Dyke did not give the CMBOE legal advice as to how the update in the law might apply to the CMBOE and the Charlotte–Mecklenburg school system. (FF no. 25.)

8. Regarding Dr. Smith's and Dyke's discussions, Dyke has not disclosed any of the content of those conversations to either Pollard or Parsons. (FF no. 27.)

9. Dr. Smith did not discuss with Dyke matters related to the *Capacchione* matter which was not in existence in the Fall of 1996 or January 1997. (FF nos. 4, 9.)

10. The presentation to the CMBOE was made at a conference room at the Charlotte–Douglas Airport and there were people other than the CMBOE present including members of the news media. (FF no. 23.)

11. At the briefing, Dyke and his associates made it clear that they were speaking to the members of the CMBOE generally as to the state of the law and could not offer legal advice to CMBOE. (FF no. 24.)

12. The *Capacchione* suit was not filed until September 7, 1997. (*See* document no. 1.)

13. The Swann case was not reopened until this Court granted the Motion to Reopen by the Swann Plaintiffs on March 5, 1998. (FF no. 29.)

14. Regarding his conversations with Dr. Smith, Dyke has not discussed the content of those conversations with either Pollard or Parsons. (FF no. 27.)

15. During the briefing, Dyke did not address anything specific regarding *Swann*. (FF nos. 22, 24, 25.)

16. Dr. Smith did not tell Dyke facts that Dr. Smith considered to be important when determining the unitary status of a school system. His conversations with Dyke were of a more general nature. (FF no. 17.)

17. Dr. Smith did not give Dyke his assessment of where he, the Board as a whole, or the individual board members were on the question of unitary status. (FF no. 16.)

18. It was Dr. Smith's judgment, not CMBOE's, as to the issues Dyke should address. (FF no. 19.)

19. Dr. Smith did not give Dyke any information that was not a matter of public record. Moreover, any member of the public could readily obtain such information by simply surveying the open records of the School District (FF no. 20.)

In sum, the Court finds that the evidence does not indicate that any confidential matters were revealed to Dyke by Dr. Smith or anyone else. Further, nothing Dr. Smith discussed with Dyke was, or could be, reasonably considered confidential because it was all a matter of public record. While this admission, by itself, may not be dispositive, it militates strongly against a finding of an attorney-client relationship and the need to disqualify. Moreover, because the information disclosed by Dr. Smith is all in the public record, the Court finds that Dr. Smith could not have had a reasonable expectation of confidentiality regarding his discussions with Dyke that would now preclude Mr. Pollard or Mr. Parsons from representing Capacchione. McGuire Woods did not represent the CMBOE, and has never represented that body. Dyke's role was merely educational and in the nature of a seminar on a point of law; it in no way was connected with the particular facts of this litigation and does not rise to the level of an attorney-client relationship under the ethical rules which would prevent McGuire Woods from representing Capacchione.

While the Court must give some weight to Dr. Smith's and Dyke's subjective belief that some of the matters they discussed were confidential, the facts cited above show that the matters discussed were in fact not confidential and, for the purposes of this motion to disqualify, there was no attorney-client relationship that would disqualify McGuire Woods.

### 2. *Substantially Related Test*

The second prong is whether the matters were substantially related. At first blush, it appears that the matters were substantially related. However, a closer analysis reveals that they were not.

With respect to the briefing and Dyke's discussions with Dr. Smith in the Fall of 1996, Dyke's only activity was to give a briefing which was educational in nature, and addressed, in general, unitary school systems and school desegregation and the changes in the federal law since the *Swann* decision in 1971. Thus, it is true that Dyke's briefing did address the issue of school desegregation and unitary school systems, but only in a general and educational manner. Importantly, Dyke specifically, and expressly, did not address the facts regarding the unitary status of the Charlotte–Mecklenburg school district. (FF nos. 1, 21, 22.) In fact, when asked, Dyke and his associates refused to attempt to apply the law to the facts of the Charlotte–Mecklenburg school system. (FF no. 24.) Further, Dr. Smith did not tell Dyke facts that Dr. Smith considered to be important when determining the unitary status of a school system; his conversations with Dyke were of a more general nature; and Dr. Smith did not give Dyke his assessment of where he, the Board as a whole, or the individual board members were on the question of unitary status.

Here, the specific determination of whether the Charlotte–Mecklenburg school system is unitary is a fundamental issue in the matters before the Court. This fundamental issue is precisely what Dyke and his associates refused to address, and the information about which Dr. Smith did not convey to Dyke. For these reasons, the Court finds that the matters were not substantially relat-

ed. *See Travco Hotels, Inc. v. Piedmont Natural Gas Co.,* 332 N.C. 288, 420 S.E.2d 426 (1992).

In sum, because there was no attorney-client relationship between McGuire Woods and CMBOE, and the matters were not substantially related, CMBOE failed to establish either part of the two-part test. Accordingly, the Court will deny CMBOE's Motion to Disqualify.

### 3. *Balancing the Practical Considerations*

Further, when considering the motion under the particular circumstances of this case, as the Court must, the Court finds that, even if there was an attorney-client relationship, nothing transpired between Dr. Smith and Dyke which would require McGuire Woods, or Pollard and Parsons in particular, to be disqualified from representing Capacchione in this matter.

In this case, it is clear that Capacchione chose to have Pollard and Parsons represent her in this lawsuit, and she now objects to the motion to disqualify them. The Court is mindful that disqualifying a party's chosen representative is a very serious matter. Further, disqualifying chosen counsel in this case would prejudice Capacchione. As the School Board itself noted, Mr. Pollard, and his former firm, Blakeney and Alexander, have been involved in the issues regarding the school system and the desegregation order in *Swann* on numerous occasions. (School Board's Mem. in Support of Motion to Dismiss at 3.) Pollard's and his firm's prior involvement in *Swann,* coupled with the common issues of law and fact between the matters in *Capacchione* and *Swann,* give Pollard and his firm an enhanced ability to be Capacchione's zealous advocate in this matter.[9] Moreover, the Court also finds that, given Pollard's and his former law firm's prior experience in these matters, Pollard's and Parsons's representation of Capacchione will assist the Court in an efficient resolution of the matters before the Court. Thus, their representation of Capacchione is in the interests of justice.

Next, there is little, if any, prejudice to the School Board if Pollard and Parsons continue to represent Capacchione. As discussed *supra,* nothing Dr. Smith discussed with Dyke was confidential. Even if it were, there would be no prejudice to the School Board because Dyke did not, and affirmed that he would not, disclose any of the information to Pollard, Parsons, or any other attorney at the firm associated with the *Capacchione* matter. In the same vein, both Pollard and Parsons testified that they have not been privy to the content of the conversations and were not aware that the conversations took place until just before they raised the issue with the Court. What's more, even if Pollard and Parsons would become privy to the discussions between Dr. Smith and Dyke, by accident or otherwise, there would continue to be little or no prejudice to the School Board because everything Dr. Smith discussed with Dyke is a matter of public record and readily obtainable through discovery.

Further damaging to the School Board's Motion to Disqualify are the safeguards against a conflict developing. First, there is the ethical obligation of counsel which binds all of the attorneys at McGuire Woods and prevents Dyke from divulging, and Pollard and Parsons from seeking, the content of the conversations between Dr. Smith and Dyke. In fact, the present Motions have prompted specific assurances in this regard, and the Court will give that obligation significant weight. *See Shaffer,* 966 F.2d at 146. Similarly, the deterrent effect of sanctions is an additional safeguard. *Id.*

Finally, the Court finds that denying the Motion to Disqualify in this case would not in any manner compromise the integrity of this proceeding. As stated *supra,* there was no attorney-client relationship, and Dr. Smith did not divulge any confidential matters to Dyke. Further, the conversations between Dr. Smith and Dyke occurred in the Fall of 1996 while Dyke was a member of McGuire Woods working in the firm's main office in Richmond, Virginia. This was long before McGuire Woods and Blakeny & Alexander

---

**9.** This fact, no doubt, was a factor in Capacchione's initially choosing Pollard and the firm to represent her in this matter, and in now objecting to the Motions to Disqualify and Withdraw.

began merger negotiations. · Further, Pollard and Parsons agreed to represent Capacchione well before the merger was complete, and certainly were not aware of the alleged conflict until after the merger was complete. Thus, at the time the conversations occurred, the two law firms were totally separated and insulated without any reason, or opportunity, for Pollard and Parsons to become privy to the conversations.

In addition, Dyke is an attorney practicing law in Virginia and is not licensed in North Carolina and the record does not show that he ever practiced in North Carolina. In the same vein, because McGuire Woods is a very large law firm with more than 350 attorneys, and Dyke works at the firm's main office in Richmond, Virginia and Pollard and Parsons work in the Charlotte, North Carolina office, a "Chinese wall" between Dyke and Pollard and Parsons would be an effective tool to safeguard the integrity of this proceeding,[10] Out of an abundance of caution, the Court will order that Dyke and his associates involved with the briefing given to the CMBOE be totally insulated from this litigation.

On the other hand, *granting* the Motion to Disqualify might have the undesirable effect of compromising the integrity of the proceedings. As the Fourth Circuit and other federal courts have noted, the Court must remain "mindful of the opposing possibility of misuse of disqualification motions for strategic reasons," *Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142 (4th Cir.1992) (quoting *Woods v. Coving-*

*ton County Bank,* 537 F.2d 804, 813 (5th Cir.1976)).[11]

Under these circumstances, it simply cannot be said that allowing McGuire Woods to continue to represent Capacchione would compromise these proceedings.

In sum, the Court finds that the important right of Capacchione to chosen counsel and the substantial hardship which may result from disqualification weighs heavily in favor of denying the Motion to Disqualify. Next, the Court finds that the School Board would be harmed very little, if at all, by McGuire Woods continuing to represent Capacchione. Finally, McGuire Woods's continued representation of Capacchione will not compromise the trust in, and integrity of, the judicial system and these proceedings. For all of the foregoing reasons, even if there were an attorney-client relationship between Dr. Smith and McGuire Woods, the Court would deny the School Board's Motion to Disqualify.

**B. MOTION TO WITHDRAW**

 District courts may, under local rule, condition withdrawal of representation on leave of the court, pursuant to 28 U.S.C. § 1654. *Towns v. Morris,* 50 F.3d 8 (4th Cir.1995) (Table); *Daniels v. Brennan,* 887 F.2d 783, 784 n. 1 (7th Cir.1989). In the Western District of North Carolina, the court has made such provision under Rule 1(c) of the Rules of the United States District Court

---

**10.** Erecting internal screening procedures ("Chinese wall") which purport to insulate one or more of a law firm's attorneys who are disqualified from representing a client because of a conflict of interest from a prior representation is an accepted practice in the federal courts for cases in which a former government attorney moves into private practice. *See, e.g., Greitzer & Locks v. Johns–Manville Corp.,* 710 F.2d 127 (4th Cir. 1982) (reversed district court and held that screening procedures would effectively insulate remainder of firm from disqualified attorney preventing law firm from imputed disqualification even though firm was very small with only six attorneys and there was no doubt that attorney was disqualified). *Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir.1980) (en banc), *vacated and remanded on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *see also* Brown, *Sufficiency of screening measures (Chinese Wall) designed to prevent disqualification of*

law firm, member of which is disqualified for conflict of interest, 68 A.L.R.Fed. 687 (1984) (listing cases). Courts have also employed the screening procedures in lieu of the drastic measure of disqualification in cases not involving former government attorneys. *See, e.g., NFC, Inc. v. General Nutrition, Inc.,* 562 F.Supp. 332, 334–35 (D.Mass.1983) (denying motion to disqualify entire law firm and employing screening procedures to insulate attorney from his new law firm because the attorney had investigated the defendants for possible antitrust violations when the attorney was associated with a former law firm).

**11.** *See also Plant Genetic Systems v. Ciba Seeds,* 933 F.Supp. 514, 517 (M.D.N.C.1996); *Buckley v. Airshield Corp.,* 908 F.Supp. 299, 307 (D.Md. 1995).

for the Western District of North Carolina. Local Rule 1(c) provides:

> If it will not delay a scheduled hearing or trial, counsel may file written consent of their client to their withdrawal and at the same time cause to be filed an appearance by other counsel, and such substitution of counsel shall be effective without court approval. Except for such substitution of counsel, there shall be no effective withdrawal except on order signed by one of the judges of the court.

Because counsel has not filed written consent of their client to their withdrawal, counsel is precluded by Rule 1(c) from withdrawing without leave of the court.

 An attorney seeking to withdraw must establish that his client consents or that a valid and compelling reason exists for the court to grant the motion over an objection. *Stafford v. Mesnik,* 63 F.3d 1445, 1448 (7th Cir.1995).[12] Similar to a motion to disqualify counsel, a motion to withdraw is not to be taken lightly. An attorney's obligation to represent his client is one of the paramount obligations undertaken in the attorney-client relationship. *Smith v. Anderson–Tulley Co.,* 608 F.Supp. 1143, 1146–47 (S.D.Miss.1985), *aff'd,* 846 F.2d 751 (5th Cir.1988). Thus, once an attorney or law firm undertakes these duties, the attorney or law firm may not be relieved of these duties without compelling reasons. *Stafford,* 63 F.3d at 1448.[13] Of course, an attorney has a continuing obligation to completely disclose to his client any conflicts. Finally, whether an attorney is justified in withdrawing from a case will depend upon the particular circumstances of the case, and no all embracing rule can be formulated. *Smith v. Bryant,* 264 N.C. 208, 210, 141 S.E.2d 303, 305 (1965).

 In this case, Pollard and Parsons move to withdraw from this matter for the same reasons the School Board filed its Motion to Disqualify: the possible existence of a conflict because the information obtained by Dyke in conversations with Dr. Smith may have been confidential disqualifies Dyke from representing Capacchione, and Dyke's disqualification is imputed to Pollard and Parsons because the attorneys are associated in the same law firm. First, the Court notes that Pollard and Parsons have met their ethical obligation to raise the issue of possible conflicts by filing their Motion to Withdraw. Second, for all of the same reasons the Court denied the Motion to Disqualify, the Court finds that there is no compelling reason for Pollard, Parsons, or McGuire Woods to withdraw from representing Capacchione in the matters before the Court. Accordingly, the Court will deny the Motion to Withdraw.

## III. CONCLUSION

In sum, the Court will deny the Motion to Disqualify and the Motion to Withdraw because there was no attorney-client relationship between Dr. Smith or CMBOE and McGuire Woods, the matters were not substantially related, and McGuire Woods's continued representation of Capacchione will not compromise the public's trust in, and integrity of, the judicial system and this proceeding.

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion to Disqualify [document no. 29] be, and hereby is, **DENIED.**

**IT IS FURTHER ORDERED** that McGuire Woods's Motion to Withdraw [document no. 19] be, and hereby is, **DENIED.**

**IT IS FURTHER ORDERED** that Dyke and his associates involved with the briefing given to the CMBOE be totally insulated from this litigation as follows:

(a) they are excluded from participating in this litigation;

(b) they shall not have access to any files or other information regarding this matter;

**12.** Citing *Woodall v. Drake Hotel, Inc.,* 913 F.2d 447, 449 (7th Cir.1990); *see also Smith v. Anderson–Tulley Co.,* 608 F.Supp. 1143, 1146–47 (S.D.Miss.1985), *aff'd,* 846 F.2d 751 (5th Cir. 1988); *Smith v. Bryant,* 264 N.C. 208, 141 S.E.2d 303 (1965); *Perkins v. Sykes,* 233 N.C. 147, 63 S.E.2d 133 (1951).

**13.** *See also Huang v. Board of Governors University of North Carolina,* 902 F.2d 1134 (4th Cir. 1990); *Anderson–Tulley,* 608 F.Supp. at 1147.

(c) no one at the firm may discuss the matter in their presence or allow them to view any documents or other information related to this litigation.