Ronnie **SANDERSON, Plaintiff,**

v.

**BODDIE–NOELL ENTERPRISES, INC., Defendant.**

No. CIV.A. 3:04CV888.

United States District Court,
E.D. Virginia,
Richmond Division.

May 26, 2005.

Joel Bieber, Esquire, The Joel Bieber Firm, Richmond, VA, for Plaintiff.

C. Kailani Memmer, Esquire, Guynn Memmer & Dillon PC, Roanoke, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on the defendant's Motion For Sanctions (Docket No. 23). According to the motion, plaintiff's counsel, Joel Bieber, initiated improper *ex parte* communications with the employer of the defendant's expert witness for the purpose of preventing the expert from testifying at trial. The defendant contends that plaintiff's counsel has violated Fed.R.Civ.P. 26(b)(4); and, therefore, that the Court should exercise its inherent authority to impose sanctions, asserting that dismissal of the action is the only appropriate sanction.

The parties briefed the motion, and the Court conducted an evidentiary hearing. Upon the completion of the hearing, the Court took the matter under advisement. The matter is now ready for decision.

## BACKGROUND

In this slip and fall case, the plaintiff, Ronnie Sanderson, alleges that the defendant, Boddie–Noell Enterprises, Inc., was negligent in failing to clear ice and snow from the sidewalk leading to its Hardee's restaurant. Sanderson alleges that as a direct and proximate result of this negligence, he fell and suffered permanent injuries to his ribs, back and abdomen.

In defending against the negligence claim, the defendant contends that, at the time the alleged slip and fall occurred, precipitation in the form of freezing rain, sleet, and/or snow was falling. This assertion could be dispositive on the issue of liability because, under Virginia law, a defendant's duty to remove snow and ice from its premises does not arise until "a reasonable time" after the storm has ended. *FAD Ltd. Partn. v. Feagley*, 237 Va. 413, 377 S.E.2d 437 (1989).

On March 4, 2005, in anticipation that the defendant would present the testimony of an expert meteorologist to establish that the storm was still underway at the time of the plaintiff's fall, the plaintiff designated an expert meteorologist, Dr. Raymond Lee, to testify that the storm had ended by that time.[1] Apparently, Dr. Lee was Mr. Bieber's second choice. Shortly before designating Dr. Lee as his meteorology expert, Mr. Bieber, who regularly advertises on WRIC Channel 8, a local ABC affiliate in Richmond, Virginia, telephoned Richard DePilla, the advertising manager at the station[2] and inquired wheth-

---

1. The defendant also has filed a motion *in limine* seeking to preclude Dr. Lee from testifying on the ground that the plaintiff's disclosure did not comply with the requirements of Fed.R.Civ.P. 26(a)(2)(B).

2. *See* Hearing Transcript, May 16, 2005, at 9

er WRIC would allow one of its meteorologists to serve as an expert witness in a pending civil case. HT at 14. Mr. DePilla was not familiar with the station's policy on that point, and he presented the question to WRIC's general manager, Mr. Robert Peterson, who advised that the station would not allow one of its meteorologists to serve as an expert witness. *See id.* Subsequently, Mr. DePilla passed that information along to Mr. Bieber.

On April 1, 2005, the defendant designated John Bernier, the chief meteorologist at WRIC, as its expert meteorological witness.[3] Mr. Bernier has been a meteorologist at WRIC since 1984 and has appeared on the station's local news broadcasts more than 9,000 times. Shortly after the defense counsel disclosed the identity of Mr. Bernier and served Mr. Bernier's expert report, Mr. Bieber again telephoned Mr. DePilla, and informed him that, contrary to what Mr. DePilla had said in early March about the station's policy, the party opposing Mr. Bieber in a civil case had hired Mr. Bernier as its expert witness. Mr. DePilla immediately informed Mr. Peterson about his conversation with Mr. Bieber. Thereupon, Mr. Peterson instructed the WRIC station manager, Matthew Zelkind, to instruct Mr. Bernier not to testify. According to Mr. Peterson's testimony, he informed Mr. Zelkind to tell Mr. Bernier:

> That it was my policy, station policy, that no one could accept outside employment, under contract could accept outside employment without our express permission, that I didn't think it was appropriate for our employees to be accepting outside employment as professional—expert professional witnesses—and, therefore, that we would deny his request to—or it wasn't a

request—but we'd deny him the ability to serve as an expert witness.

*Id.* at 21.[4] Mr. Zelkind confronted Mr. Bernier later that afternoon, as the weatherman was preparing to go on the air for the evening newscast. Mr. Zelkind told Mr. Bernier that the station had received a call from Mr. Bieber that morning informing them that Mr. Bernier was to testify as a witness against his client in an upcoming case. After Mr. Bernier acknowledged that he had been retained for that purpose, Mr. Zelkind told Mr. Bernier that the station would not permit him to testify. *Id.* at 36–38. Mr. Zelkind further admonished Mr. Bernier that he was violating the terms of his employment contract with WRIC by working as an expert witness, and that the station could fire him for this breach.[5] *See id.* Mr. Bernier initially protested, pointing out to Mr. Zelkind that he had testified numerous times as an expert over the past twenty-one years, and that no one at the station previously had voiced an objection.[6] However, Mr. Zelkind persisted, and Mr. Bernier acquiesced and agreed not to testify. Subsequently, Mr. Bernier informed counsel for the defendant that he would be unable to testify for the defendant at trial.

Counsel for the defendant immediately called Mr. Bieber to complain about Mr. Bieber's interference and threatened to seek sanctions. In an apparent attempt to rectify the problem and thus to preclude the need for any sanctions against him or his client, Mr. Bieber sent a letter to Mr. Peterson in which he made it clear that he would not object if Mr. Bernier was allowed to testify for the defendant in this case. Mr. Bieber

---

("HT at ___."). Mr. DePilla testified that he has known Mr. Bieber for a number of years. Further, Mr. DePilla approximated that Mr. Bieber buys $100,000 a year of advertising on WRIC.

**3.** It is unclear whether plaintiff's counsel was aware of who the defendant's meteorology expert would be before disclosure was made.

**4.** WRIC is owned by Young Broadcasting of Richmond, Inc., one of the family of companies owned by Young Broadcasting, Inc., a Tennessee company. The corporate entity that is Mr. Bernier's employer will be referred to as "WRIC" or "the station."

**5.** According to Mr. Peterson, Mr. Bernier's employment contract, which was standard for most WRIC news broadcasters, prohibited him from accepting any paid outside employment without the express written authorization of the station. HT at 27.

**6.** At the evidentiary hearing, Mr. Bernier testified that the station's recalcitrance with regard to his testifying as an expert in this case was curious in light of the fact that he had served as an expert witness in various civil matters, on average, three times every two years, from 1984 until 2005.

subsequently reaffirmed this position on the record in this matter.

At the hearing on May 16, the Court attempted to undo the damage by suggesting to WRIC's counsel that the appropriate recourse might be to allow Mr. Bernier to testify in this case without any threat of adverse employment action or retaliation. Considering that Mr. Bernier had been allowed to testify more than a dozen times over the past twenty-one years notwithstanding the preclusive language of his contract, the Court suggested that the station might consider allowing him to testify in this case, especially since the station's intervention had not occurred until after Mr. Bernier had been designated as an expert witness and had tendered an expert report. The Court took a recess in order to afford counsel for WRIC an opportunity to discuss the suggestion with WRIC's management.

After discussing the matter with management, counsel for WRIC advised that Mr. Bernier would not be fired if he testified in this matter, but that WRIC would reserve the right to take other disciplinary action, ranging from admonition to suspension. Mr. Bernier subsequently advised defendant's counsel that he would testify if the Court instructed him to do so. However, because Mr. Bernier faced the possibility of disciplinary action (other than termination) if he continued to work on this case, the defendant decided not to press for Mr. Bernier's testimony.

The defendant argues that, because the plaintiff's counsel's *ex parte* communication with the employer of the expert witness in early April had the effect of preventing Mr. Bernier from being able to testify in this case, dismissal of this action is warranted. Although the defendant concedes that lesser sanctions are available, it maintains that lesser sanctions would be insufficient to rectify the harm that has occurred to its case. The defendant argues as follows:

Bernier has been the chief meteorologist at WRIC in Richmond since 1984. For over 20 years, John Bernier has been on television in the central Virginia area and has served as an expert testifying in cases in state and federal courts for the last decade. Given Bernier's face recognition, as well as his reputation in central Virginia,

and as leading [sic] meteorologist in central Virginia, his face and name recognition simply cannot be replaced by another meteorologist.

Def.'s Mot. For Sanctions at 4.

## DISCUSSION

It is well-established that district courts are "charged with the duty and responsibility of supervising the conduct of attorneys who appear before it." *Tessier v. Plastic Surgery Specialists*, 731 F.Supp. 724, 729 (E.D.Va. 1990). "Imposition of discipline is necessary for the preservation of the integrity and public repute of the Court and the bar, and to enforce respect for the Local Rules of this Court." *In re Fisherman's Wharf Fillet, Inc.*, 83 F.Supp.2d 651, 664 (E.D.Va.1999).

The Supreme Court has held that the authority of district courts to impose sanctions against parties "extends to a full range of litigation abuses." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). As the United States of Appeals for the Fourth Circuit has put it, district courts have the "inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461 (4th Cir.1993). "This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers." *Id.* Therefore, a district court, can, upon a finding that a party has willfully violated a rule of conduct and/or procedure, impose an appropriate sanction. *See id.*

### A. Whether Plaintiff's Counsel Violated Applicable Rules Of Ethics

■ The ethical standards governing the practice of law in the United States District Court for the Eastern District of Virginia are defined by the Virginia Rules of Professional Conduct (the "Virginia Rules"). *See* Local Rule of Civil Procedure 83.1(I). According to Rule 3.4(g) of the Virginia Rules, an attorney shall not "[i]ntentionally or habitually violate any established rule of procedure or of evidence, where such conduct is disruptive of the proceedings." S.Ct. Of Va. R., Part Six, § II, Rule 3.4(g). The defendant argues that, by making *ex parte* communications

with the employer of the defendant's expert witness, plaintiff's counsel violated Fed. R. of Civ. P. 26(b)(4), which implicitly limits an opposing counsel's communication with an expert witness to interrogatories and depositions. *See Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir.1996); *Campbell Indus. v. M/V Gemini*, 619 F.2d 24 (9th Cir.1980). If plaintiff's counsel wilfully violated Fed. R.Civ.P. 26(b)(4), the defendant's argument goes, then he has breached his ethical obligation under Rule 3.4(g) and thus has violated Local Rule 83.1(I).

In *Erickson*, a *pro se* plaintiff filed suit against the manufacturer of his mobile home, alleging, *inter alia*, fraud and negligent design. The plaintiff retained a metal expert to testify about the structural integrity of the trailer. *Erickson v. Newmar Corp.*, 87 F.3d at 299–300. During a break at the deposition of the plaintiff's expert, defense counsel took the plaintiff's expert aside and offered to hire him as an expert witness in an unrelated case. The plaintiff's expert accepted defense counsel's offer to pay him $100.00 an hour to work on that unrelated case. *Id.* The next day, after firing his metal expert for disloyalty, the plaintiff filed a motion for judgment and sanctions against the defendant for tampering with his expert witness. *Id.*

In considering the district court's denial of the motion, the Ninth Circuit recognized that two fundamental issues were raised by the facts: (1) whether defense counsel's *ex parte* communication and subsequent offer of employment to plaintiff's counsel's expert was unethical; and (2) if so, what sanctions were appropriate. *Id.* at 301. As to the first issue, the court noted the inherent authority of the district courts to regulate the conduct of lawyers who appear before them, and then turned to the applicable Local Rules for the District of Nevada to ascertain whether a violation had occurred. The court found that attorneys appearing in federal district court were obligated to adhere to the Nevada Rules of Professional Conduct, which made it unethical for an attorney to disobey an obligation owed to the court. *Id.*

The Ninth Circuit held that Fed. R. of Civ. P. 26(b)(4) outlined the pertinent "obligations" owed by lawyers as to communication with expert witnesses. *See id.* at 301. Although Rule 26(b)(4) did not explicitly pro-

hibit the type of communication that had occurred in *Erickson*, the Ninth Circuit held that, by expressly limiting communication between an expert witness and opposing counsel to interrogatories and depositions, Rule 26(b)(4) implicitly prohibited all other forms of communication. *See id.* (citing 2 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 3.4:402 (2d ed. Supp.1994)). Because defense counsel's *ex parte* communication with the expert witness exceeded the narrow scope of Rule 26(b)(4), the Ninth Circuit reasoned that counsel had acted unethically and thereby had violated the Local Rules. *See id.*

The facts in *Erickson* are similar to the facts in this case, but there is a critical difference. In *Erickson* the improper *ex parte* communication occurred between defense counsel and the plaintiff's expert witness directly. In this case, however, the *ex parte* communication occurred between plaintiff's counsel and the employer of the expert witness. Because Mr. Bieber had no direct communication with Mr. Bernier, he did not violate Fed.R.Civ.P. 26(b)(4). Thus, the rule of *Erickson* is not applicable.

However, Mr. Bieber's conduct violates Virginia Rules of Professional Conduct 3.4(a) which provides that a lawyer shall not "[o]bstruct another party's access to evidence or alter, destroy or conceal a document or other material having potential evidentiary value for the purpose of obstructing a party's access to evidence." S.Ct. Of Va. R., Part Six, § II, Rule 3.4(a). Legal Ethics Opinion (LEO) No. 1678, issued on September 5, 1996, by the Virginia State Bar, addresses the issue of interference with an opposing party's expert witness.

The facts underlying LEO No. 1678 are similar to those presented here. In a medical malpractice action, plaintiff's counsel designated Dr. D, a junior member of Medical Practice Group G, as an expert witness. LEO No. 1678, 1996 Va. Legal Ethics Ops. LEXIS 19, *1 (September 5, 1996). Several weeks after plaintiff's counsel made this designation, defense counsel designated Dr. K, a senior member of Medical Practice Group G, as his expert. *Id.* Defense counsel had used Dr. K as an expert in previous cases and was

aware that Dr. G was Dr. K's subordinate in their medical practice group. *Id.* After being retained by defense counsel, Dr. K had conversations with Dr. G in which he admonished his younger associate about the disadvantages of testifying against another physician from the community, as well as the inappropriateness of taking a position contrary to that of one of his partners. *Id.* Subsequently, Dr. K informed plaintiff's counsel that he would be unable to testify. *Id.*

Asked to consider whether defense counsel had an ethical obligation to advise his expert, Dr. D, not to communicate with or otherwise put pressure on Dr. K, the committee concluded that he did not. In reaching this conclusion, the committee cited the controlling ethical precept as follows:

[I]t is not ethically permissible for a lawyer directly to advise the other party's expert witness not to testify, *or indirectly, through another acting at the lawyer's request to cause* the other party's expert witness not to testify. A lawyer *may not do indirectly* what he is prohibited from doing directly.

*Id.* at *4–5 (citing Rule 8.4(d), f/k/a DR 1–102(A)(2)). In the absence of any evidence that Dr. K's communications with Dr. D had been made at the behest or with the consent and knowledge of defense counsel, the committee held that the controlling ethical standard had not been violated. *See id.*

Unlike the facts in LEO No. 1678, it is apparent here that WRIC's intervention to foreclose Mr. Bernier's continued service as a designated expert witness was caused, albeit indirectly, by Mr. Bieber. It is undisputed that Mr. Bieber communicated with the advertising manager at WRIC within a few days of receiving the defendant's expert disclosure. During that conversation, Mr. Bieber, having been previously informed that the station did not allow its employees to serve as expert witnesses, made known to his long-time acquaintance, Mr. DePilla, that WRIC's chief meteorologist had been retained by the opposing party in one of his cases. As the reasonably foreseeable result of this communication from Mr. Bieber, one of the station's "significant" advertisers, Mr. DePilla took the matter to the general manager, who then instructed the station manag-

er to prohibit Mr. Bernier from fulfilling his antecedent obligation to testify for the defendant. The station manager did that and also advised Mr. Bernier that he that his employment could be terminated if he continued to work on the case. As the reasonably foreseeable consequence of Mr. Bieber's conversation with Mr. DePilla, Mr. Bernier withdrew as the defendant's expert witness.

Although Mr. Bieber concedes that the "end result" of his conversation with Mr. DePilla was that Mr. Bernier was forbidden from testifying, Mr. Bieber argues that he should not be sanctioned because he never intended to bring about that result. Specifically, Mr. Bieber asserts that he never directed Mr. DePilla to see about having Mr. Bernier removed from the case or otherwise threatened to cease advertising with WRIC if Mr. Bernier testified. Also, Mr. Bieber argues that, had his intent been to remove Mr. Bernier from the case, he would not have later written a letter to the general manager requesting that Mr. Bernier be allowed to testify.

However, under LEO No. 1678 and the applicable Virginia Rules of Professional Conduct, Mr. Bieber's lack of intent argument misses the mark. LEO 1678 concluded that the conduct of the expert (Dr. K., the senior member of the group) could not be imputed to defense counsel. Central to that conclusion, however, was the finding that the defendant's expert had reached out to the plaintiff's expert on his own, without any previous communication with, or prompting by, counsel. *See id.* In this case, Mr. Bieber, a significant advertising customer of WRIC, directly raised with the station's sales manager the participation of the station's employee as an adverse expert witness in this case.

As a direct and reasonably foreseeable consequence of that communication, WRIC prohibited Mr. Bernier from testifying, notwithstanding that Mr. Bernier previously had testified over a dozen times while under the employ of WRIC, including one previous appearance on behalf of the defendant in this case. Thus, Mr. Bieber deliberately set into motion a series of events that had the effect of obstructing the defendant's ability to use

454

the services of its designated expert witness. Whether he intended that result is not dispositive of the issue because Mr. Bieber is chargeable with knowledge of the reasonably foreseeable consequences of the acts in which he deliberately engaged.

For the foregoing reasons, Mr. Bieber violated Virginia Rule of Professional Conduct 3.4(a). Accordingly, under the Court's inherent powers, he may be sanctioned for his failure to adhere to the applicable rules of conduct applicable in these proceedings. *See* Local Rule 83.1(I).

## B. The Appropriate Sanction

The Fourth Circuit recognizes that exercise of a district court's inherent power can be used to "issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions." *Id.* at 462 (emphasis added). Because the sanction of dismissal is the most severe of the possible sanctions, the Fourth Circuit also has held that "such orders must be entered with the greatest caution." *Id.*

■ In *Shaffer*, the Court of Appeals held that, notwithstanding a finding that plaintiff's counsel had violated a general duty of candor to the tribunal as well as the specific duties imposed by Rule 3.3 of the West Virginia Rules of Professional Conduct and Fed. R.Civ.P. 26(e)(2), dismissal was not an appropriate sanction. *See id.* In so doing, the Court outlined several factors that should be considered when assessing sanctions:

(1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by his attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring

similar conduct in the future; and (6) the public interest.

*Id.* at 462–63 (emphasis added). In reversing the district court's remedy of dismissal and remanding the case for imposition of a lesser sanction, the Fourth Circuit concluded that "the district court's objective of punishing the wrongdoers, deterring similar future conduct, and compensating the defendant [could be] achieved by a sanction, short of dismissal, tailored more directly to those goals." *Id.* at 463.

■ Here, the defendant makes the argument that nothing short of dismissal will rectify the harm to its case. Specifically, the defendant contends that "[t]he prejudice to Boddie–Noell is extreme as Boddie–Noell has now lost its only liability expert a short time period prior to trial and simply cannot replace its unique and well-recognized expert who would have substantial credibility before a jury." Def.'s Mot. For Sanctions at 8. Careful consideration of the *Shaffer* factors augers in favor of imposing a lesser sanction.

### 1. *Shaffer* Factor 1

Here the wrongdoer is plaintiff's counsel who argues that he is not culpable because he did not intend to derive the defendant of the services of Mr. Bernier. That, however, overlooks the obvious fact that, under the circumstances, it was reasonably foreseeable that counsel's conduct likely would lead to the employer's decision that foreclosed Mr. Bernier from fulfilling the task for which he had been retained.

Mr. Bieber was a customer of WRIC who spent significant sums advertising his law practice on WRIC every year. In March, before learning that Mr. Bernier had been retained by the plaintiff, Mr. Bieber arranged for additional advertising on behalf of a charity and, in the process, asked WRIC's sales manager whether a WRIC meteorologist could testify in a pending case (this one). The issue was taken to the station's chief executive and Mr. Bieber was told that he had answered in the negative, stating that policy forbade such employment.[7] Shortly,

---

7. Mr. DePilla's affidavit says that the inquiry was a general one, unrelated to a specific, pending case. However, his testimony at the hearing and

that of Mr. Peterson refute that averment, and show that the inquiry was related to a pending case.

after learning that Mr. Bernier had been retained and with knowledge of Mr. Bernier's effective expert report, Mr. Bieber called the sales manager and reported that Mr. Bernier was acting contrary to the policy of which he had been told two weeks earlier.

Mr. Bieber is a well-educated man whose profession requires the exercise of logical thought and the use of facts to achieve specifically desired results. He is chargeable with knowledge that an employer who is told that an employee is violating company policy [8] likely will instruct the employee to cease and desist from the violation. And, as an experienced lawyer, Mr. Bieber knew, or is chargeable with, the knowledge that, if Mr. Bernier was instructed to comply with WRIC's policy, the likely result was that Mr. Bernier would be rendered unavailable to testify for the defendant.

Thus, Mr. Bieber's conduct, which he readily admits had that precise result, is significantly culpable.

### 2. *Shaffer* Factor 2

Mr. Sanderson, the client, was entirely blameless in creating the result wrought by Mr. Bieber's conduct.

### 3. *Shaffer* Factor 3

Mr. Bieber's conduct has deprived the defendant of its chosen expert whose fees to date exceed $3,000 for consulting and preparing the report required by Rule 26. That, in turn, will preclude the trial of this case as scheduled. Thus, the prejudice to the judicial process and to the administration of justice is significant.

### 4. *Shaffer* Factor 4

The prejudice to the defendant also is significant because it lost the services of a highly qualified expert and its fee to the expert has gone for naught. The defendant is obviously prejudiced by the need to incur the expense of retaining another expert and the expense of further litigation.

The defendant asserts additional prejudice based on the fact that the lost expert was irreplaceable because he is so well-known in

the area from which this division of the Court draws its jurors. It certainly is true that Mr. Bernier is well-known in the area, but that is not a fact that changes the prejudice analysis.

### 5. *Shaffer* Factor 5

Sanctions other than dismissal are available to punish the culpable person, to compensate the defendant, and to deter similar conduct.

### 6. *Shaffer* Factor 6

The public interest factor here implicates a number of concerns. First, the public interest is served when cases are addressed on their merits, whether by trial or otherwise. Second, the public interest is served by levying blame on culpable persons, not blameless ones. Third, the public interest requires that those harmed by improper conduct be recompensed. Finally, the public interest requires that those who practice the profession of law be held to account for their missteps, particularly those that cause harm to an adversary and interferes with the administration of justice.

Taking into account all of the facts and the *Shaffer* factors, the Court concludes that the sanction of dismissal is not appropriate. The Court has considered removing Mr. Bieber as counsel of record in this case, but that sanction, although appropriate, will cause serious harm to the plaintiff and additional harm to the defendant. On balance, the appropriate sanction is to require Mr. Bieber to compensate the defendant for the fees charged by Mr. Bernier, the fees of the replacement expert, and the fees incurred by defendant's counsel in working with Mr. Bernier, in prosecuting this motion and in securing and working with a new expert, as well as fees proximately caused by the delay that necessarily will occur hereafter. Counsel shall submit forthwith a statement of fees charged by Mr. Bernier and Mr. Bieber shall pay those immediately. At the conclusion of this action, counsel shall submit a statement for all other fees and expenses.

---

8. The policy, if there was one, had not been applied to Mr. Bernier over the preceding twenty-one years. And, it appears that Mr. Peterson decided that there was to be a policy when confronted with Mr. Bieber's request in March.

455

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by facsimile and regular mail.

It is so ORDERED.